**WOMEN STRIKE FOR PEACE,**
Appellant,

v.

**Walter J. HICKEL, Secretary of the Interior, Appellees.**

No. 23268.

United States Court of Appeals
District of Columbia Circuit.

Argued July 16, 1969.

Decided Aug. 1, 1969.

---

Robb, Circuit Judge, dissented.

Mr. Elliott C. Lichtman, Washington, D. C., with whom Mr. Ralph J. Temple and Mrs. Margery Waxman Smith,

Washington, D. C., were on the motion, for appellant.

Mr. Gil Zimmerman, Asst.U.S.Atty., argued the opposition to the motion for appellees. Messrs. Thomas A. Flannery, U.S.Atty., and John A. Terry, Asst.U.S.Atty., also entered appearances for appellees.

Before WRIGHT, LEVENTHAL and ROBB, Circuit Judges.

PER CURIAM:

The summary judgment granted appellee is reversed, and the cause is remanded for further proceedings. Judge LEVENTHAL has written an opinion supporting this result. Judge WRIGHT is of the view, as set forth in his separate opinion, that the court should enter a further order in protection of the interests asserted by appellant. However, he concurs in Judge LEVENTHAL's opinion as far as it goes, and he joins in the foregoing result for the purpose of obtaining an effective mandate of this court. Judge ROBB has filed a dissenting opinion.

LEVENTHAL, Circuit Judge:

Appellant is a peace organization seeking use of the national park area known as the Ellipse for the purpose of holding an antiwar demonstration in early August 1969, on the anniversary of the bombing of Hiroshima and Nagasaki. A controversy arises because the organization wishes to construct a visual display, 8′ high, 20′ long, and 6′ deep, in order to present a graphic peace message that will focus attention upon appellant's vigil. The National Park Service is willing to consider the issuance of a permit for a public gathering on the Ellipse to express the desire of appellant's members for "peace in general and for peace in Vietnam in particular." But the Park Service has categorically refused to issue a permit which will authorize appellant to construct the display it desires.

Appellant brought this action in the District Court urging that the denial of a permit violates its constitutional rights. It contends that the use of a graphic display in order to dramatize its peace message is activity that comes within the protection of the First Amendment, and, further, that the display is crucial to its proposed demonstration. It also claims a denial of equal protection of the law [1] because the Park Service annually authorizes the use of structures on the Ellipse by another private group in connection with the Christmas Pageant of Peace.[2]

The Government argues that the case essentially involves only a request for a privilege, to erect a structure on Government park land,[3] and claims that

1. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

2. Thus the Christmas Pageant of Peace, Inc., made application on October 8, 1968, and on October 25, 1968 was granted a permit for the exclusive use of the Ellipse area, adjacent roadways, and stage, for the purpose of preparing for and conducting the annual Christmas Pageant of Peace Program from Wednesday, December 14, 1968, through midnight, Sunday, January 2, 1969.

The Ellipse is an elliptical park area. It is close to the White House lawn, but is separated by the iron picket fence around the White House, the adjoining passenger walkway, and an automobile thoroughfare (South Executive Avenue and E Street) accommodating six lanes of auto traffic and central divider.

3. The Government takes the view that appellant's request arises under 36 C.F.R. § 50.7(i) as an application for a permit to build a structure on park lands. Appellant acted under 36 C.F.R. § 50.19 in applying for permission to conduct a public demonstration in the Ellipse area, and considers the structure or display to be a part of that demonstration.

36 C.F.R. § 50.19, applicable expressly to the National Capital Region, is virtually identical to 36 C.F.R. § 2.21, which applies generally to the national parks, and provides that "public gathering"—including not only parades, ceremonies and entertainments but also "meetings, assemblies and demonstrations" for public expression of views—are permitted in the parks on obtaining a permit. (All C.F.R. citations in this opinion are to the Janu-

freedom of expression is involved only incidentally. It also claims that appellant's demonstration is entirely distinguishable from the annual Christmas Pageant of Peace.

The District Court granted the motion of the National Park Service for summary judgment. We reverse that summary disposition and remand for further proceedings.

We are not called upon here to determine to what extent the interest in communication of ideas is or may be subordinate to other interests of the Government in regard to parks. Assuming that legitimate park policy may permit or require overriding a claim to freedom of expression in some instances, when a group, like appellant, makes a colorable claim of an interest in freedom of expression, the claim requires

consideration by the Park Service on a reflective basis.[4]

Parks are a particular kind of community area that, under the Anglo-American tradition, are available, at least to some extent and on a reasonable basis, for groups of citizens concerned with expression of ideas.[5] The regulations of the National Park Service expressly contemplate that parks may be used for this purpose.[6]

We turn to the narrower question whether appellant may erect a "display" —what the Government refers to as a "structure."

 Certainly pictorial displays have at least a prima facie relevance to freedom of expression. Non-speech activities may be protected by the First Amendment.[7] The foregoing is of

---

ary 1969 revision.) Section 50.19(c) (2) and (3) provides:

> (2) *Issuance of permit.* The park Superintendent shall issue an official permit upon proper application unless;
> (i) A prior application for the same time and place has been made which has been or will be granted.
> (ii) The event will present a clear and present danger to the public health or safety.
> (iii) The event is of such nature or duration that it cannot reasonably be accommodated in the particular area applied for.
> (3) *Conditions.* The permit may contain such conditions as are reasonably consistent with protection and use of the area for the purposes for which it is maintained and as are otherwise consistent with the regulations in this part. It may also contain reasonable limitations on the time and area within which the event is permitted.

The only distinctions drawn in this section between types of gatherings relate not to permissibility of use, but to availability of Park Service facilities and equipment, such as platforms, chairs, and lighting. These may be made available without charge in the case of "civic and patriotic assemblages, and athletic and entertainment programs which are presented as a public service" without admission charge or solicitation of funds. Otherwise they must be provided by the sponsors of the meeting, subject to approval of the Superintendent.

No permit is required for six specific areas in the Capital. 36 C.F.R. § 50.19 (b) (1)–(6).

> 36 C.F.R. § 50.7(i) provides:
> *Fences and other structures.* No person shall enclose any area covered by this part or erect any fence, wall, or build any trail, road, bridge or other structure in any area covered by this part, except pursuant to the provisions of an official permit.

4. *See* WAIT Radio v. F.C.C., 135 U.S. App.D.C. 317, 418 F.2d 1153 (June 24, 1969).

5. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places, has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." Opinion of Justice Roberts in Hague v. C.I.O., 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L. Ed. 1423 (1939). This passage was approved by Chief Justice Vinson in Kunz v. New York, 340 U.S. 290, at 293, 71 S.Ct. 312, 95 L.Ed. 280 (1951).

6. 36 C.F.R. § 50.19, *supra* note 3.

7. *See, e. g.,* Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (display of a red flag); labor picketing, Thronhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940);

course subject to the doctrine which holds that when activity (or conduct) has both "speech" and non-speech elements, a substantial Government interest in regulation of the non-speech element may justify an incidental restriction on First Amendment freedoms.[8]

We do not understand the Park Service to assert that its regulations requiring a permit for "structures" would enable it to adopt an iron policy forbidding any and all structures in parks. Such a position would lead to the absurdity of permitting gatherings, but prohibiting speaker's stands.

The record does not clearly set forth the basis on which the Park Service denied the permission requested by appellant for its particular display. The letter of the Park Service denying appellant's request said that "we do not view the erection of a 'symbolic anti-war display' structure approximately 20 feet long, 8 feet high and 6 feet deep as an appropriate use of Federal park lands." [9] This letter, which contains what logicians call a negative pregnant, leaves it unclear whether the refusal of the Park Service was based on the theme or the size of appellant's proposed display. These present quite different legal considerations. If the problem had been identified as size, perhaps the matter could have been settled by agreement.

There may obviously be considerations justifying limitations on a display's size, duration, or positioning (e.g., limiting placement to a corner of the park), in order to avoid or limit interference with other simultaneous uses of the park.

The record also contains an earlier Park Service letter which refers to appellant as seeking a permit for an "illuminated billboard." [10] Does this indicate that some visual display might be acceptable, but that the Park Service considered an illuminated display to be objectionable as garish? If this was crucial, a clearer statement of the attitude of the Park Service might have obviated or confined the controversy. We would have supposed that all appellant intended to request was a 3-dimensional visual display that was floodlit at night, as is the Nativity scene of the annual Christmas pageant. The Christmas floodlit display is certainly not fairly described as an illuminated billboard. But perhaps this phrase cannot provide illumination for us, and was intended—and reiterated by counsel at argument—to provide color for a denial based on other grounds.

Again, it is not clear whether the objection was solely to the display on the Ellipse or would have applied to other Park grounds. It may well be that a sound park policy could accommodate the use of some park areas for public expression, and reservation of certain park areas for other purposes. However, we have not been presented with a coherent statement of park policy along these lines.

Government counsel urged at argument that the case might be disposed of on the principle that some park areas may be reserved for calm and quiet. That principle may be accepted, but it hardly seems pertinent to the Ellipse,

flag salute ceremonies, West Virginia State Board v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ; a motion picture, Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L. Ed. 1098 (1952) ; sit-in demonstrations, Brown v. Louisiana, 383 U.S. 131, 141–42, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) ; wearing arm bands, Tinker v. Des Moines, School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1968).

8. See United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

9. Letter of May 26, 1969, from William R. Failor, Superintendent, National Capital Parks-Central (the cognizant division of the National Park Service) to counsel for appellant, attached as Exhibit J to Complaint.

10. Mr. Failor's letter of December 18, 1968, to counsel for appellant, Exhibit F to Complaint.

which frequently witnesses the exuberance of four simultaneous softball games, not to mention arrivals and departures at the centrally located helicopter pad.

The Government does not assert that park policy precludes erection on the Ellipse either of all displays, or of displays that carry a message. The Christmas Pageant of Peace which it annually authorizes includes an enormous Christmas tree, an array of smaller evergreens, various choral, band and speakers' platforms, and a lighted life-size Nativity scene. A prime purpose of the pageant is to proclaim the message of "peace on earth to men of goodwill." [11]

■ The affidavit of the head of the Capital Division of the Park Service seeks to distinguish the Christmas Pageant for Peace on the ground that this is a "recreational event." It has that aspect but since it plainly does have, and is intended to have, a message, the effort to label it as merely "recreational," in the hope that it can be assimilated to the kind of use on the Ellipse illustrated by softball games, is entirely too shallow to support restriction on First Amendment activities.

■ The Park Service affidavit also stresses the participation of the President, the Secretary of the Interior, and other Cabinet officers in the Christmas Pageant program. The argument seems to be that this participation identifies the Christmas Pageant program as a "quasi-governmental activity." This aspect of the case is not immaterial but reflection reveals that it is not decisive and indeed may raise more questions than it answers. This reflection could begin with the problem of the political party, which in basic legal conception stands on much the same ground as any other organization or assembly of citizens, not excluding appellant—that is to say, it is a group of persons with rights of assembly, and a desire to express ideas and to influence governmental policy. The President and Cabinet members typically attend meetings of their political party, and indeed, they are expressly exempt from the Hatch Act. There is an undoubtedly close relation between political parties and the Government: they may share the same leaders; they are subject to similar constitutional restraints concerning the responsibility of recognizing rights of individual citizens who desire to affect their programs. But the Park Service could hardly justify granting access to a park by the party in power, because its meeting was attended by Cabinet officers, while denying it to other groups of citizens.

The District Judge referred to the fact that Christmas is a national holiday declared by Congress. And indeed Congress has declared it to be a legal public holiday, see 5 U.S.C. § 6103. Curiously this point was not even noted in the Park Service affidavit.[12] Yet it is obviously an important consideration.[13]

11. Program of the 1968 Christmas Pageant of Peace, p. 1:

The Christmas Season in the Nation's Capital centers around the Pageant of Peace, which had its beginning when a group of leaders in the Washington Community established the Pageant as a visible expression of this Nation's desire for "Peace on Earth, To Men of Goodwill." This theme is expressed by the Pageant and is highlighted by the lighting of the National Christmas Tree by the President of the United States.

The Pageant has been repeated every year for the past fourteen years, and now, as it opens its fifteenth annual celebration, the Pageant of Peace is firmly established as a national tradition, a visible expression of this Nation's aspirations and desires to foster understanding and friendship between the nations of the world and the American people.

12. The affidavit does refer only to "the traditions and spirit of the Christmas holiday season," but that relates to a quite different aspect of the matter.

13. The Christmas Pageant's use of the park goes on for a much longer time than December 25 (see note 2), but this extention is presumably ascribable to the custom merging this one-day legal holiday into a longer holiday season, ending with the other nearby legal holiday set for New Year's Day.

It seems fitting and proper to use the Capital or national parks for observance of a national legal holiday, for Christmas no less than the Fourth of July with its fireworks (and speeches). Moreover, and significantly, this is a national holiday that our country shares with others. The 1968 program provided, in addition to music and ceremonial amenities, a climax in the form of the President's Christmas Greeting to the World.

These are forceful considerations, yet stubborn questions remain. For it may well be an essential, not an accidental, part of the Christmas Pageant, with its religious aspects, that it is conducted by a private organization. Government counsel put it at argument that Christmas is no longer a purely religious holiday, that it has also become a secular holiday.[14] In a way it has, and it is commonplace for non-Christians in the United States to exchange gifts and greetings in this season.

Yet questions might well arise whether the visual display of the Nativity scene that is a standard feature of the Christmas Pageant may properly be described as a governmental activity. In this regard it should be noted that the Ellipse is not part of the White House lawn.

The question is not whether the District Court or this court can think of ways on which the Christmas Pageant can be distinguished from appellant's proposal. Of course it can be distinguished. One sensible distinction might well be the time of year; the winter season is more traditional for visual display, and display at that time has less

possibility of interfering with recreational use of the Park. But that would not be a sound basis for disposition of the underlying controversy, for the Park Service rejected appellant's 1968 request for use of the Ellipse during a period following New Year's Day 1969.

█ It is not for this or any other court to construct guides for park use. The duty of the court is to assure our citizens that the Park Service has rules, or criteria, or guidelines. These will naturally seek to further park objectives. Yet the Park Service must also take into proper account matters that have at least a non-frivolous constitutional aspect, and must take a hard look at them and give them reflective consideration.

In this opinion we have adverted to aspects of the controversy as to which the Park Service position is not clear. We do not think controversies like this one should be determined on the basis of conclusory correspondence or terse affidavits. What is needed for appropriate judicial disposition is a more complete and illuminating presentation of Park Service policy than is available on the papers before us.

██ Typically reversal of summary judgment is for the purpose of a trial or evidentiary hearing by the court, and that may prove necessary in this case. But it is not inevitable. It may be obviated if the Park Service undertakes to define and announce a set of coherent park policies, clarifying the matters that are as yet unclear, and perhaps modifying the policies on further reflection as to the interaction of the various interests properly taken into account.[15] Per-

---

14. *Compare* Braunfield v. Brown, 366 U.S. 599, 605, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) ("the Sunday law simply regulates a secular activity").

15. Constitutional principles applicable to permit systems are discussed in, *inter alia,* Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); N.A.A.C.P. v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

The right to use the parks for expression of ideas is subject to appropriate regulation of the parks, *see* Roberts, J., in Hague v. C.I.O., 307 U.S. 496, at 516, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

The park authorities have the function of considering and accommodating the various interests involved. The authority of the Park Service, to prescribe reasonable conditions as to time, place and manner of use of the parks of the nation and its capital city, encompasses a decision to permit a visual display, but to confine it,

haps the case can be disposed of by agreement. If not, the court can consider the validity of Park Service policies in the light of a fuller presentation of the intent and content of those policies.

■■ Our remand disposition means of course that appellant cannot schedule its August 1969 program as desired. But this does not moot the case. There is an underlying controversy evidenced by similar requests of appellant for January 1969 and for Easter. When controversies present what are essentially recurring issues of public interest they are not mooted because the most recent particular occasion for consideration of the issue has come and gone.[16]

**J. SKELLY WRIGHT, Circuit Judge (concurring):**

I agree with Judge Leventhal that the grant of summary judgment in favor of the Government must be reversed. On the basis of this record, however, I believe that the appellant is further entitled to an injunction directing the Park Service to issue a permit for the construction of appellant's display.

This is not a case where the Government seeks to preserve the property under its control for its own exclusive use.[1]

On the contrary, the Government concedes that the Ellipse is an appropriate forum for public debate; the National Park Service is willing to grant appellant a permit to assemble and to picket there.[2] The Service has, however, declined to allow appellant, as part of the demonstration, to construct a graphic display 20 feet long by eight feet high by six feet deep. In a series of letters to appellant, the Park Service rested its refusal solely on the ground that such a structure would not be "an appropriate use of Federal park lands."[3]

I

There can be no doubt, as Judge Leventhal notes, that pictorial expression is within the protection of the First Amendment.[4] Ordinarily, of course, no permit is required for the exercise of First Amendment freedoms. Indeed, the elimination of such "prior restraints" was a central purpose of the First Amendment.[5] Thus the Supreme Court has emphasized that any system of prior restraint involving permits, licenses, or even court injunctions, "comes to this Court bearing a heavy presumption against its constitutional validity." Carroll v. President & Comm'rs of Town of Princess Anne, 393 U.S. 175, 181, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968).[6]

---

say, to a particular corner of a park, or to a particular orientation in that area, or perhaps to a removable float rather than a fixed structure, so as to minimize interference with recreational use by others.

16. Friend v. Unitel States, 128 U.S.App. D.C. 323, 325, 388 F.2d 579, 581 (1967), and cases cited.

1. See Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

2. Appellee's Memorandum of Points and Authorities (in the District Court) at 1; see also Shuttlesworth v. Birmingham, 394 U.S. 147, 152, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Hague v. C.I.O., 307 U.S. 496, 515–516, 83 S.Ct. 328 (1939).

3. Letter from William R. Failor, Superintendent, National Capital Parks-Central, to Elliot C. Lichtman, May 26, 1969, attached to the complaint as appellant's Ex-

hibit J. The National Park Service did not object to the display on the ground that the specific design contemplated was offensive, too large, etc. Since appellant has not, either in brief or at argument, produced even a sketch of the display, I would allow the Park Service to raise specific objections to the display in subsequent proceedings in the District Court.

4. Judge Leventhal's opinion at page 600 and cases cited in Note 7 thereof.

5. Lovell v. Griffin, 303 U.S. 444, 451–452, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

6. The Government has contended that no issue of censorship or restriction on First Amendment freedoms is involved in this case because appellant is free to conduct its assembly and to picket on the Ellipse. But even the restriction on *methods* of communication must be justified by a sub-

When citizens seek to use publicly owned land for their speeches and rallies, however, their action potentially conflicts with the coordinate rights of others seeking to use the same public areas. Under these circumstances, permit systems have been approved which narrowly and precisely regulate and resolve these conflicts.[7] In considering such permit systems, the Supreme Court has consistently reiterated two propositions: (1) Standards for granting or denying permits which affect free expression must be precise and must not be left to the discretion of administrative officials.[8] Such standards must be announced and generally applicable so that the controls on official discretion can be quickly tested in court if the permit is denied.[9] (2) Many asserted governmental interests are "insufficient" to support curtailment of various modes of expression.[10] In slightly different contexts, the Court has spelled out the implications of this second requirement. It has held that only a compelling governmental interest can justify a regulation which, even though directed at conduct, "incidentally" restricts First Amendment freedoms.[11] Moreover, the incidental restriction must be no greater than is essential to the furtherance of that interest.[12]

Under these standards, the Government may properly regulate demonstrations to "[prevent] *serious* interference with normal usage of streets and parks * * *." Kunz v. New York, 340 U.S. 290, 293–294, 71 S.Ct. 312, 315 (1951). (Emphasis added.) But the burden rests upon the Government to demonstrate the compelling interest requiring the restriction of free expression and to show that the regulation serves that interest with the least restriction possible on the citizen's ability to communicate his political dissent. In this case, the Park Service has not only failed to meet this burden, it has been unable to articulate any policy in support of its action beyond its general judgment that appellant's display is not "appropriate." [13]

## II

Timeliness is essential to effective dissent. Delay may stifle protest as effectively as outright censorship.

stantial state interest. Schneider v. State, 308 U.S. 147, 164, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

7. *See* Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953).

8. *See, e. g.,* Shuttlesworth v. Birmingham, *supra* Note 2, 394 U.S. at 150–151, 89 S.Ct. 935; Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951).

9. *See* Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963): "We have tolerated such a system [of prior restraint] only where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraint."

10. *See* Schneider v. State, *supra* Note 6, 308 U.S. at 162, 60 S.Ct. 146.

11. N.A.A.C.P. v. Button, 371 U.S. 415, 438, 83 S.Ct. 328 (1963); Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960).

12. Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *see also* United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 20 L.Ed. 2d 672 (1968).

13. The Government has urged that adequate support and sufficiently precise standards for this judgment are provided by 16 U.S.C. § 1 (1964):

"* * * The [National Park] service * * * shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations * * * to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

Beyond its extraordinarily general terms, this statutory provision relates solely to conservation. The Park Service did not make reference to this policy in its negotiations with appellant, nor did it evince any interest in issues relevant to such a policy such as the amount of damage appellant's structure was likely to inflict upon the park grounds.

" * * * It is vital to the operation of democratic government that the citizens have facts and ideas on important issues before them. A delay of even a day or two may be of crucial importance in some instances. * * *"

A Quantity of Books v. Kansas, 378 U.S. 205, 224, 84 S.Ct. 1723, 1732, 12 L.Ed. 2d 809 (1964) (dissenting opinion of Mr. Justice Harlan). Here the Park Service's refusal to grant a permit has already resulted in two long delays of appellant's demonstration. The Supreme Court cases, as well as those in the lower courts, clearly indicate that in the absence of a properly administered permit system, people are free to exercise their First Amendment freedoms.[14] They are not required to return time and again to the licensing authority to discover whether the officials can formulate new policies which will withstand scrutiny. At the time appellant applied for a permit, the Park Service offered no policy which could constitutionally have justified denial of appellant's application. I would order the Park Service to grant the permit.

Since neither of my colleagues agrees with this disposition of the case or with each other, in order to reach a result I reluctantly concur in the remand of this case to the District Court. A clarification of Park Service policy in this area of First Amendment freedoms may serve to encourage rather than restrict their exercise.

ROBB, Circuit Judge (dissenting):

The appellants argue that they are subject to invidious discrimination because they are denied the right to erect a structure on the Ellipse, whereas that right has been granted in the past to the Christmas Pageant of Peace. The argument fails for the reason that the appellants' project and the Christmas Pageant of Peace are not comparable; in other words, there is a reasonable distinction between the two. The Christmas Pageant is a quasi-governmental activity sponsored and participated in by the President and conducted in his own backyard. Other sponsors and participants are numerous government officials and agencies, both federal and state, and foreign nations and their representatives. None of these features is found in the project contemplated by the appellants. Although as the appellants state the Pageant is financed and sponsored by private individuals and groups, these facts do not in my opinion change its fundamental character. I therefore reject the argument that the appellants are the victims of invidious discrimination.

As their second argument the appellants assert that the First Amendment gives them the right to erect and maintain on the Ellipse for a week a structure described by them as "an illuminated three-dimensional display approximately 20 feet long, 8 feet high and 6 feet deep." The argument does not persuade me. I do not believe that freedom of speech includes the right to deface and clutter the Ellipse with what amounts to billboard advertising, by whatever name it may be called.[1] The exercise of their First Amendment rights by the appellants does not entitle them to override

14. Indeed, the Supreme Court has held that citizens, confronted with a permit system which is void on its face, "may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license." Shuttlesworth v. Birmingham, supra Note 2, 394 U.S. at 151, 89 S.Ct. 77 at 939. Since the method of expression at issue here has apparently not been subject to judicial scrutiny before, appellant has chosen the more responsible course of challenging the Government in court. But the principle remains the same: to prevent a chilling effect upon expression which is constitutionally protected, appellant must be allowed to proceed without interference unless the Government acts on the basis of a constitutional permit system. See A Quantity of Books v. Kansas, 378 U.S. 205, 210, 84 S.Ct. 1723 (1964).

1. I doubt that such a display would be permitted beside a Federal-Aid highway. See 23 U.S.Code § 131.

the right of other citizens to enjoy an unblemished and uncluttered park.

The issue here is not whether the appellants may assemble or make speeches or distribute literature or display flags or placards. There is only one issue before us, namely, whether the park authorities may properly refuse to allow the appellants to erect and maintain their display on the Ellipse.

I would hold that the prohibition of the appellants' structure by the park authorities is reasonable and proper.