Ramon RUIZ and Anita Ruiz,
Plaintiffs-Appellants,

v.

Rogers C. B. MORTON, Secretary of the
Interior, Defendant-Appellee.

No. 25568.

United States Court of Appeals,
Ninth Circuit.

May 31, 1972.

Rehearing Denied Aug. 31, 1972.

Winton D. Woods, Jr. (argued), Tucson, Ariz., Lindsay Brew (argued), Sells, Ariz., Anthony B. Ching, Tucson, Ariz., for plaintiffs-appellants.

Carl Strass, Washington, D. C. (argued), Raymond N. Zagone, Shiro Kashiwa, Asst. Atty. Gen., Washington, D. C., Richard K. Burke, U. S. Atty., Richard S. Allemann, Asst. U. S. Atty., Phoenix, Ariz., for defendant-appellee.

Before BARNES, MERRILL and KILKENNY, Circuit Judges.

KILKENNY, Circuit Judge:

Ramon and Anita Ruiz, appellants in this cause, are members of the Papago Tribe of American Indians. They reside with one of their children in Ajo, Arizona, some fifteen miles from the Papago Indian Reservation. The Ruiz home is in a section of Ajo known as the "Indian Village," where the community is predominantly of Papago origin.

Appellants left the Papago Reservation approximately thirty years ago to seek employment in the copper mines near Ajo, operated by the Phelps-Dodge Company. Ramon Ruiz worked in the copper mines until they were closed by a strike on July 19, 1967. Unable to obtain other employment, Ruiz sought welfare assistance from the state of Arizona. He was informed by the Pima County Welfare Director, however, that neither general assistance nor emergency relief from the Arizona Department of Public Welfare was available to striking union members.[1] At the time, the Ruiz family was receiving fifteen dollars per week from the union in the form of strike benefits.

On December 11, 1967, Ruiz applied for general assistance benefits from the Bureau of Indian Affairs [Bureau]. The Bureau notified appellants by letter of December 13, 1967, that such benefits were not available to them. Ruiz appealed to the Superintendent of the Papago Indian Agency, then to the Phoenix Area Director of the Bureau, and was granted a hearing before the latter on January 23, 1968. Under departmental regulations, general assistance benefits are made available only to those Papago Indians living within the boundaries of a reservation.[2] The Ruiz appeal was denied on January 25, 1968. The parties agree that the sole reason for the denial of general assistance benefits to appellants was the fact that they resided outside the boundaries of the Papago Reservation.

On February 19, 1968, appellants brought their action in federal district court to compel payment of general assistance benefits to them. The court, after a hearing on cross-complaints for summary judgment, dismissed the complaint and entered judgment in favor of the Secretary of the Interior. This appeal followed.[3]

Appellants contend that the policy of the Secretary and the Bureau is inconsistent with (1) Congressional intent to provide aid for needy Indians, and (2) constitutional due process.

■ The initial legislative approval of expenditures here characterized as "general assistance," the Snyder Act of 1921,[4] authorized the Bureau, as supervised by the Secretary of the Interior, to expend "such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians *throughout the United States. . . .*" [Emphasis supplied] In evalu-

1. *See,* 15 A.R.S. § 46–233, subsec. A, par. 4 [Supp.1971]; *see also,* letter of November 8, 1968, from Pima County Welfare Director Ever L. Hanson to appellants' attorneys.

2. 66 Bureau of Indian Affairs Manual 3.1.4(A).
"*Residence.* Eligibility for general assistance is limited to Indians living on reservations and in jurisdictions under the Bureau of Indian Affairs in Alaska and Oklahoma."

3. The Secretary does not raise the issue of mootness on this appeal: in any event, we note that the "continuing controversy" limitation on the mootness doctrine applies here. Friend v. United States, 128 U.S.App.D.C. 323, 388 F.2d 579, 581 (1967); Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F.2d 597, 604 (1969); *cf.,* Quevedo v. Collins, 414 F.2d 796, 797 (5th Cir. 1969).

4. 25 U.S.C. § 13, 42 Stat. 208 (1921).

ating the Congressional intent that lay behind this enactment, we keep in mind the rule that statutes are to be given, wherever possible, "such effect that no clause, sentence or word is rendered superfluous, void, contradictory or insignificant." Rockbridge v. Lincoln, 449 F.2d 567, 571 (9th Cir. 1971); Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

■■ The Snyder Act provides that benefits are to be available to Indians "throughout" the United States and, absent persuasive reasons to the contrary, courts will give statutory words their ordinary meaning. Banks v. Chicago Grain Trimmers Ass'n, 390 U.S. 459, 465, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968). The ordinary meaning of the preposition "throughout" is expansive,[5] and it is not the type of restrictive word Congress would presumably have utilized had it intended to limit general assistance to reservation Indians. There is nothing equivocal about the phrase "throughout the United States," nor do we find anything in the legislative history of the Act that counters its broad thrust.

Although, as the Secretary argues, it is evident that Congress did not intend to create new programs through passage of the Snyder Act, neither did it intend to constrict the Bureau's jurisdiction nor the scope of expenditures already being made by the agency.[6] It is not precisely clear what these earlier expenditures encompassed, but they included general funds for "numerous activities . . . undertaken in order to more speedily bring about the civilization of the Indian tribes. . . ."[7] It is clear, moreover, that the jurisdictional responsibility of the Bureau had traditionally extended beyond the borders of the reservation. The authority of the Commissioner of Indian Affairs substantially pre-dated the establishment of many reservations, and his jurisdictional mandate was sweeping.[8] Congressional interest in the general welfare of those Indian tribes not hostile to the United States was apparent in the period surrounding the creation of the commissioner's office,[9] and was reflected in the broad grant of authority to that office.

■ This legislative and administrative background supports the reading we have given the statute, applying the ordinary sense of its text. That background indicates Congressional concern extending to the general welfare of all Indians, irrespective of their place of residence. Our duty is to construe the Act in a fashion which best serves the clearly indicated legislative purpose, and we decline to adopt a narrow reading that would counter the wide responsibility that Congress has entrusted to the Bureau. Hudson Distributors, Inc. v. Eli Lilly & Co., 377 U.S. 386, 84 S.Ct. 1273, 12 L.Ed.2d 394 (1964); Federal Trade Commission v. Fred Meyer, Inc., 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d

---

5. The preposition "throughout" is defined in Webster's New International Dictionary, 2d Edition, as follows: "All the way from one end to the other of; in or to every part of; during the whole course or period of; as *throughout* the house; *throughout* the year."

6. H.R.Rep.No.275, 67th Cong., 1st Sess. (1921); S.Rep.No.294, 67th Cong., 1st Sess. 52 (1921).

7. Letter from Acting Secretary of the Interior, E. C. Finney, to Sen. Charles Curtis, Chairman of the Committee on Indian Affairs, August 19, 1921; S.Rep. No.294, 67th Cong., 1st Sess. 52 (1921).

8. The office of Commissioner of Indian Affairs was established in 1832, to have "the direction and management of all Indian affairs, and of all matters arising out of Indian relations. . . ." 4 Stat. 564, 22nd Cong., 1st Sess., Ch. 174 (1832).

9. *Cf.*, 4 Stat. 564, 22nd Cong., 1st Sess., Ch. 174, § 4 (1832) [prohibition of "ardent spirits" in Indian country]; 4 Stat. 514, 22nd Cong., 1st Sess., Ch. 75 (1832) [making available supplies of smallpox vaccine to the Indian tribes]; 4 Stat. 616, 22nd Cong., 2d Sess., Ch. 40 (1833) [appropriations for Indian annuities]; 4 Stat. 705, 22nd Cong., 2d Sess., Ch. 105 (1833) [appropriations of general benefits to "effect certain Indian treaties."].

1222 (1968); Logan Lanes, Inc. v. Brunswick Corp., 378 F.2d 212 (9th Cir. 1967), cert. denied, 389 U.S. 898, 88 S. Ct. 219, 19 L.Ed.2d 216 (1967). Even if some uncertainty as to the construction of the Act existed, we would be compelled to resolve it in favor of the appellants.[10] Statutes, such as the Snyder Act, passed for the benefit of Indians and Indian communities, are to be liberally construed. Rockbridge v. Lincoln, *supra*; Hopkins v. United States, 414 F.2d 464 (9th Cir. 1969). In light of the foregoing, we conclude that Congress intended general assistance benefits to be available to all Indians, including those in the position of appellants, at the time the Snyder Act was passed.

Congressional action following the Snyder Act illustrates the continuing broad scope of responsibility lodged in the Bureau, with no indication of any developing policy to exclude nonreservation Indians. The House Report on the Johnson-O'Malley Act of 1934,[11] for example, asserted federal responsibility for the Welfare of those Indians intermixed with the general community, and concluded that it would be advantageous to permit certain health and educational services for those Indians to be transferred to state agencies for reasons of economical administration. The trans-

fers were to impose no additional financial burden on the states, since the cost of providing services to the nonreservation Indians would be borne by the federal government. This report had the approval of the Commissioner of Indian Affairs, whose accompanying letter did not indicate any reticence to provide services for these off-reservation groups.[12] Later federal action in the area of welfare does not reveal any intent to displace the general assistance system of the Snyder Act, originally available to *all Indians*. The legislative history of the Social Security Act, to illustrate, is silent on that legislation's relationship to the Snyder Act. In sum, neither party has indicated to us a federal act usurping the jurisdiction of the Bureau over Indian welfare, granted in 1832 and reaffirmed by the Snyder Act.

Nor, for that matter has the agency itself shown a less expansive attitude than Congress toward its jurisdiction in related areas of service. Scholarship funds are available to off-reservation students.[13] General assistance grants are available to those Indians in Alaska and Oklahoma not living on reservations.[14] Loans "to promote the economic development of the borrower" can be obtained by Indians and Indian groups without apparent regard for residency.[15] Health benefits, adminis-

---

10. As the Supreme Court has stated in the context of unclear Congressional intent:

   "Doubtful expressions are to be resolved in favor of the weak and defenseless people who are wards of the nation, dependent upon its protection and good faith." Squire v. Capoeman, 351 U.S. 1, 6–7, 76 S.Ct. 611, 615, 100 L.Ed. 883 (1956).

11. H.R.Rep.No.864, 73d Cong., 2d Sess. (1934).

12. "In many sections of the country there are many people of Indian blood who are so definitely a part of the general population that it is neither necessary nor wise for the Federal Government to deal with them on any segregated plan. In much of this rural area where Indians are living, educational, health, and other facilities are so limited that it is highly desirable for the Federal Govern-

ment and the several States to combine resources wherever possible. This has been done in the field of education and has resulted in arrangements whereby many Indian children are attending local public schools successfully with whites.

   \*   \*   \*   \*   \*

   In the case of Indians living in widely scattered communities, we find it extremely difficult to render effective service and cooperative endeavors with State authorities which would help both Indians and whites living in these more isolated areas." Letter of February 26, 1934, from John Collier, Commissioner of Indian Affairs; *see* H.R.Rep.No.864, 73d Cong., 2d Sess. (1934).

13. 25 C.F.R. § 32.1.

14. 66 Bureau of Indian Affairs Manual 3.1.4(A).

15. 25 C.F.R. § 91.

tered in conjunction with the Public Health Service are made available to off-reservation Indian groups.[16] Various Commissioners of the Bureau have proclaimed, in justifying their budget requests, that agency services extended to Indians on *or near* reservations,[17] and have used the total Indian population of the United States in citing the number of people their agency serves.[18] Needless to say, the Bureau cannot be permitted to expand and contract its jurisdiction to justify its own purposes at the expense of the group it aids.

■ Despite the foregoing, the Secretary's position is that Congress was well aware of the agency's limitation of general assistance to reservation Indi-

ans, and has acquiesced in agency policy by making appropriations limited to that group. We note that an administrative agency, such as the Bureau, has no power to create a rule or regulation that is out of harmony with the statutory grant of its authority. Dixon v. United States, 381 U.S. 68, 74, 85 S.Ct. 1301 (1965); Brannan v. Stark, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1952). Even if its position were consistent on the issue of responsibility for off-reservation Indians, there is no support in the statute for the distinction drawn by the agency. In our view, the intent of the Snyder Act is unambiguous, and the agency cannot amend it by regulation. Koshland v. Helvering, 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268 (1936).[19] Be

16. Hearings on H.R. 6767, Before a Subcommittee of the Senate Committee on Appropriations, on Department of the Interior and Related Agencies Appropriations, 89th Cong., 1st Sess., pt. 1 at 999–1001 (1965); *cf.*, 42 C.F.R. § 36.12.

17. *E. g.*, Commissioner Robert L. Bennett, Hearings on H.R. 17354, Before a Subcommittee of the Senate Committee on Appropriations, on Department of the Interior and Related Agencies Appropriations, 90th Cong., 2d Sess., pt. 1 at 368 (1968); Commissioner Philleo Nash, Hearing on H.R. 6767, Before a Subcommittee of the Senate Committee on Appropriations, on Department of the Interior and Related Agencies Appropriations, 89th Cong., 1st Sess., pt. 1 at 637 (1965).

In addition, testimony of various Bureau officials has indicated varying degrees of responsibility for off-reservation Indians. In 1959, Senator Mundt was told that from ten to twenty thousand Indians in Los Angeles alone were receiving general assistance, health insurance policies, and other services as part of the Bureau relocation program. Hearings on H.R. 5915, Before a Subcommittee of the Senate Committee on Appropriations, on Department of the Interior and Related Agencies Appropriations, 86th Cong., 1st Sess., at p. 337 (1959). Indians in other cities, whether part of the relocation program or not, were apparently receiving some assistance. *Id.*, at 338. In 1960, the House Committee on Appropriations was told that the Bureau assumes "some responsibility" for Indians living adjacent to reservations, as well as those on res-

ervations, in its relocation program. Hearing on Bureau of Indian Affairs Budget, Before a Subcommittee of the House Committee on Appropriations, on Department of the Interior and Related Agencies Appropriations, 86th Cong., 2d Sess., pt. 1 at 512 (1960).

18. Hearings on H.R. 5189, Before a Subcommittee of the Senate Committee on Appropriations, on Interior Department and Related Agencies Appropriations, 85th Cong., 1st Sess. at 284 (1957); Hearings, Before a Subcommittee of the House Committee on Appropriations, on Interior Department and Related Agencies Appropriations, 84th Cong., 2d Sess. at 460 (1956); Hearings, Before a Subcommittee of the House Committee on Appropriations, on Interior Department Appropriations [Bureau of Indian Affairs], 82d Cong., 2d Sess., pt. 1, at 202 (1952); Hearings, Before a Subcommittee of the House Committee on Appropriations, on Interior Department Appropriations [Bureau of Indian Affairs], 82d Cong., 1st Sess., at 264–265 (1951).

19. See Generally I. K. Davis, Administrative Law Treatise, §§ 5.01, et seq. (1958). Professor Davis notes that even long-standing regulations are not immune to scrutiny by the courts. Where an agency had excluded payments under the Social Security Act that the Supreme Court thought were included by Congress, the practice was overturned, as being beyond the limits of administrative interpretation. Social Security Board v. Nierotko, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946).

that as it may, the legislative history does not reveal a clear-cut policy on the part of the Bureau toward off-reservation groups. The first formalized notice of its restrictive residence policy appeared on May 12, 1952, with the publication of the Indian Affairs Manual.[20] At times, both prior to and following the rule's publication, the Bureau seems to have accepted responsibility for those non-reservation Indians living close to the reservation, excluding only those Indians in large metropolitan centers.[21]

At other times, Bureau officials seem to refer only to reservation Indians when discussing the services they offer.[22] By 1966, the Bureau was providing full welfare benefits for certain off-reservation groups, denying benefits entirely to other groups, and considering the provision of limited general assistance to still other groups.[23] This confusion over jurisdictional responsibility belies any assertion that there was a well-defined administrative position, known to and approved by Congress.[24] The Bureau is

20. 66 Bureau of Indian Affairs Manual 3.1.4(A) ; Unlike most of the regulations referred to herein, this residency restriction appears only in the Manual and does not appear in the Code of Federal Regulations. Apparently the agency is of the opinion that this section does not "relate to the public, including Indians." *See,* Introduction to Bureau of Indian Affairs Manual, § 1.2.

21. Hearings on H.R. 10433, Before a Subcommittee of the Senate Committee on Appropriations, on Interior Department and Related Agencies Appropriations, 88th Cong., 2d Sess., 227–228 (1964).
"Senator Bible. How many Indians do you have under your jurisdiction?
Mr. Nash. 380,000.
Senator Bible. How many nonreservation Indians do you have? Are those just reservation Indians?
Mr. Nash. These are *on or near.* This would not include, for example, Indians living in Los Angeles, San Francisco, Chicago, Denver, Minneapolis, *unless they were brought there as part of our vocational training or relocation programs.* [Emphasis added.]
\* \* \* \* \*
"Senator Bible. . . . where does your jurisdiction rest in that regard? Do you have a measuring stick [with regard to blood].
Mr. Nash. No, sir. Our basis for providing services to an Indian is primarily on real estate. That is, we service those individuals who reside on trust or restricted land, or so close to it that the program of the reservation would be affected by services not performed for that person."

22. Hearings on Bureau of Indian Affairs Budget, Before a Subcommittee of the House Committee on Appropriations, on Interior Department and Related Agencies Appropriations, 86th Cong., 1st Sess., at 801 (1959) :
"Miss Gifford. . . . I believe the question comes up concerning Indians living off the reservation and who are in need *not for these categories* [areas covered by Social Security] but for other types of assistance. In many cases the States and counties say that those Indians ought to be the responsibility of the Bureau of Indian Affairs ; that they do not have sufficient funds to take care of them. We have *never* included in our request for welfare appropriations funds to take care of the needs of those Indians *living off the reservation."* [Emphasis Added.]

23. The Bureau was providing "100 percent of the needs" of an Indian person or family who moved to a new location under the Bureau relocation program. These services could extend up to three years in a state such as California, which had a three-year residency requirement at the time. Contract medical care was available to Indians remote from one of the Bureau facilities. A new program was recommended for offering complete health care services to Indians living in Rapid City, South Dakota, apparently prompted by the inquiries of Senator Mundt.
On the other hand, the Bureau was denying general assistance to Indians who relocated on their own, and presumably those in the category of appellants. Hearings on H.R. 14215, Before a Subcommittee of the Senate Committee on Appropriations, on Department of the Interior and Related Agencies Appropriations, 89th Cong., 2d Sess., pt. 1, 295–302 (1966).

24. The confusion over Bureau jurisdiction had not been cleared up as late as 1971. The following colloquy between Senator

capable of articulating its position on other policy matters for consideration and adoption by Congress.[25] It has not done so here.

We conclude that the Bureau has imposed unauthorized residency restrictions upon the availability of general assistance benefits, in excess of its authority and in contravention of Congressional intent. In so holding, we do not reach the constitutional due process question raised by appellants, and express no view on the issue of whether Congress could, if it so desired, limit general assistance benefits to reservation Indians.

We hold that, under the circumstances of this case, it was improper for the Bureau to deny general assistance benefits on the basis of residency alone.

The judgment is accordingly reversed and remanded to the district court with instructions to enter a judgment in conformity herewith.

MERRILL, Circuit Judge (dissenting):

I dissent.

The question concerns the reasonableness of the construction effectively placed upon the Snyder Act by the regulation.[1] I do not find that construction to be unreasonable.

---

Bible and Mr. Bruce of the Bureau illustrates:

"Senator Bible. . . . Now what Indians are under your jurisdiction that you have a responsibility for?

First, give the qualifications. *I have never been quite sure who qualifies.* [Emphasis Added.] I have heard one-sixth and one-eighth and one-thirty-second and all kinds. What rule do you use to determine who is under your jurisdiction? Who is under the jurisdiction of the Bureau of Indian Affairs?

Mr. Bruce. American Indians living on reservations, one-fourth degree blood or more living in the United States and Alaska.

Senator Bible. One-fourth degree or more is one of the qualifications. They must also live on a reservation?

Mr. Bruce. On or near.

INDETERMINATE DEFINITIONS OF "NEAR"

Senator Bible. What does the word "near" mean?

Mr. Bruce. It is very difficult to define. *Near reservation would be a nearby community.* [Emphasis Added.]

Senator Bible. Well, half a mile, 1 mile, 5 miles, 100 yards? I am just trying to find out what your jurisdiction is. You have some responsibilities. Now what are you responsible for?

Mr. Bruce. They vary and that is why it is difficult to answer specifically.

Senator Bible. Well, give me the variable then. From 100 yards up to 10 miles?

Is that defined in a statute anywhere? If I was to become the Commissioner of Indian Affairs, God forbid, how would I know who I had jurisdiction over? They must make some determination.

Mr. Bruce: There is a definition for Oklahoma, and Alaska.

\* \* \* \* \*

Senator Bible. . . . what do your lawyers tell you is your jurisdiction? Can you go into the heart of Manhattan and find some Indian with one-fourth degree of Indian blood? Do you have jurisdiction over him in the heart of Manhattan?

Mr. Bruce. No, sir; not over Manhattan."

Hearings on H.R. 9417, Before a Subcommittee of the Senate Committee on Appropriations, on Department of the Interior and Related Agencies Appropriations, 92d Cong., 1st Sess., pt. 1, at 751 (1971). *See also,* House Hearing on the same appropriations, generally.

25. 66 Bureau of Indian Affairs Manual 3.1.4(B). The problem of duplication between federal and state welfare benefits, or other federal benefits administered by the states had been thoroughly aired, and Congressional approval of the Bureau's position is readily apparent.

1. Great weight is to be attributed to a regulation of such long standing. *See* Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). This court has similarly emphasized the deference owing to a regulation promulgated by an agency that is responsible for administration in the sphere in which the regulation operates. *See, e. g.,* Udall v. Battle Mountain Co., 385 F.2d 90, 94–96 (9th Cir. 1967), cert. denied, 390 U.S. 957, 88 S.Ct. 1041, 19 L.Ed.2d 1151 (1968).

Here, the regulation of the Bureau of Indian Affairs limiting general assistance benefits to Indians living on reservations (with exceptions for the special cases of

I think it important to note that the statute is simply one authorizing expenditures for the Indians. *See* S.Rep. No.294, 67th Cong., 1st Sess. (1921); H.Rep.No.275, 67th Cong., 1st Sess. (1921); 61 Cong.Rec. 4659, 4668–69, 4671–73, 4675, 4680, 4683–84 (1921). As such, it is quite naturally stated in the broadest terms and thus allows the Bureau of Indian Affairs to help Indians everywhere in the nation. As one commentator has noted, the Act was "intended merely as an authorization for general appropriations," with the specifics of administration left to the Secretary of the Interior and the Bureau. Wolf, Needed: A System of Income Maintenance for Indians, 10 Ariz.L.Rev. 597, 607–08 (1968).

But the granting of broad authority does not preclude (indeed, it seems to require) reasonable Bureau decisions as to how its limited funds may best be al-located and the drawing of reasonable classifications determining areas of greatest need. It does not to me seem an unreasonable determination that reservation Indians, who apparently have less employment opportunity, see Wolf, *supra*, at 598, and greater difficulty in obtaining state assistance, *see id.* at 599–606, 608–09, comprise a category particularly in need of ongoing, general financial assistance, while off-reservation Indians generally are in a better position to fend for themselves. Further, the difficulties of administering a system of general aid, if extended off reservations, would pose substantial problems.[2]

As to the constitutional questions, which the majority found it unnecessary to reach, for the reasons stated I do not regard the classifications drawn as unreasonable and a denial of equal protection. Dandridge v. Williams, 397 U.S.

Bureau jurisdictions in Alaska and Oklahoma), 66 Indian Affairs Manual 3.1.4 (A), was first issued in 1952. The Bureau's policy reflected in the regulation has been repeatedly presented to Congress. *See, e. g.,* Hearings on H.R. 9029 Before Subcom. of Senate Appropriations Comm., 90th Cong., 1st Sess., pt. 1, at 695 (1967); Hearings on Dep't of Interior & Related Agencies Appropriations for 1968 Before Subcom. of House Appropriations Comm., 90th Cong., 1st Sess., pt. 1, at 777 (1967); Hearings on H.R. 14215 Before Subcom. of Senate Appropriations Comm., 89th Cong., 2d Sess., pt. 1, at 267, 298, 301–302 (1966); Hearings on Dep't of Interior & Related Agencies Appropriations for 1967 Before Subcom. of House Appropriations Comm., 89th Cong., 2d Sess., pt. 1, at 255 (1966); Hearings on H.R. 6767 Before Subcom. of Senate Appropriations Comm., 89th Cong., 1st Sess., pt. 1, at 653 (1965); Hearings on Dep't of Interior & Related Agencies Appropriations for 1966 Before Subcom. of House Appropriations Comm., 89th Cong., 1st Sess., pt. 1, at 747; Hearings on H.R. 10433 Before Subcomm. of Senate Appropriations Comm., 88th Cong., 2d Sess., at 148 (1964); Hearings on Dep't of Interior & Related Agencies Appropriations for 1965 Before Subcom. of House Appropriations Comm., 88th Cong., 2d Sess., at 775 (1964); Hearings on H.R. 5279

Before Subcom. of Senate Appropriations Comm., 88th Cong., 1st Sess., at 70 (1963); Hearings on Dep't of Interior & Related Agencies Appropriations for 1964 Before Subcom. of House Appropriations Comm., 88th Cong., 1st Sess., at 843–844 (1963). *See also* Hearings on H.R. 10746 Before Subcomm. of Senate Appropriations Comm., 85th Cong., 2d Sess., at 292 (1958); Hearings on Dept. of Interior & Related Agencies Appropriations for 1960 Before Subcomm. of House Appropriations Comm., 86th Cong., 1st Sess., at 801 (1959).

That the Bureau has provided assistance in various forms to off-reservation Indians, *e. g.,* through programs offering relocation, educational and health care services, should not alter, in my view, this court's assessment of the Bureau's policy with regard to general assistance benefits. *See* text and note 2 *infra.* Nor do I find the majority's discussion of *jurisdictional* uncertainty on the part of the Bureau to be relevant to the narrower issue presented here as to the limited character of the general assistance program.

**2.** *See, e. g.,* Hearings on H.R. 14215 Before Subcomm. of Senate Appropriations Comm., 89th Cong., 2d Sess., pt. 1, at 301–302 (1966); Hearings on Dep't of Interior & Related Agencies Appropriations for 1960 Before Subcomm. of

471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

Nor do I find merit in appellants' contention that the regulation infringes their right to travel under Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The question there was the right of those who had recently traveled to and established residence in a particular state or the District of Columbia to stand on an equal footing respecting welfare benefits with others similarly situated in their new place of residence. It did not suggest that the travelers could claim benefits equal to those who had chosen to stay behind.

Accordingly I would affirm.

House Appropriations Comm., 86th Cong., 1st Sess., at 801 (1959); Hearings on H.R. 10746 Before Subcomm. of Senate Appropriations Comm., 85th Cong., 2d Sess., at 292-293 (1958); Hearings on H.R. 3790 Before Subcomm. of Senate Appropriations Comm., 82d Cong., 1st Sess., at 372 (1951). General assistance benefits are provided as a residual supplementing other resources and public aid that may be available.

66 Indian Affairs Manual 3.1.3, 3.1.4 (B); See Hearings on Dep't of Interior & Related Agencies Appropriations for 1960 Before Subcomm. of House Appropriations Comm., 86th Cong., 1st Sess., at 801 (1959). Unlike other types of Bureau assistance, ongoing, general assistance if extended off-reservation would require extensive and continuous participation of Bureau field workers serving individual Indians everywhere.