**WALTER HOLM & COMPANY et al.,**
**Appellants,**

v.

**Clifford M. HARDIN, Individually and as**
**Secretary of the United States De-**
**partment of Agriculture et al.**

**No. 24848.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 26, 1971.

Decided March 19, 1971.

Mr. Robert E. Herzstein, Washington, D. C., with whom Messrs. Alexander E. Bennett and Irvin B. Nathan, Washington, D. C., were on the brief, for appellants.

Mr. William D. Appler, Atty., Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., and Alan S. Rosenthal, Atty., Department of Justice, were on the brief, for appellee. Messrs. John A. Terry, Robert S. Rankin, Jr., Asst. U. S. Attys., and Morton Hollander, Atty., Department of Justice, also entered appearances for appellees.

Before McGOWAN and LEVENTHAL, Circuit Judges, and VAN PELT,* Senior District Judge, U. S. District Court for the District of Nebraska.

LEVENTHAL, Circuit Judge:

This appeal is from a judgment of the District Court, 318 F.Supp. 521, granting summary judgment to the Secretary of Agriculture and a subordinate official of the Department [1] in an action seeking

---

* Sitting by designation pursuant to 28 U. S.C. § 294(d) (1964).

1. Floyd F. Hedlund, Director of the Fruit and Vegetable Division, Consumer and Marketing Service.

injunctive and declaratory relief, brought by American importers of tomatoes from Mexico [2] attacking the validity of regulations of the Department limiting the size of such tomatoes.

■ 1. The pertinent regulations were issued by the Secretary under the Florida Tomato Marketing Order, 7 C.F.R. Part 966, which was issued pursuant to § 8c of the Agricultural Marketing Agreement Act of 1937 (Act), as amended, 7 U.S.C. § 608c. A marketing regulation placing certain restrictions on the size of tomatoes grown in Florida was issued February 17, 1970, to become effective February 23, 1970. 35 F.R. 3159–60. An accompanying Tomato Import Regulation was issued pursuant to § 8e–1 of the Act, 7 U.S.C. § 608e–1, imposing the same restrictions on imported tomatoes. 35 F.R. 3160–61. The effective date was extended and the regulations became effective April 27, 1970. They were in effect for six weeks until June 8, 1970. Although the 1969–1970 marketing season for tomatoes has expired and these particular regulations are not in current effect, the case is not moot since the problem is recurrent in nature, and pertains to matters of public import.[3]

■ 2. Appellants have standing to challenge the provisions and restrictions of the marketing order even though they are not among the domestic handlers directly governed by that order, since the law, as administered by the Secretary, results in automatic import restrictions of the same nature governing the operations of importers.[4]

The case stands before us not on a request for issuance of a particular in-junction, but on plaintiffs' prayer for declaration of their rights. The District Court granted the motion for summary judgment filed by defendants on the ground that these officials were legally empowered to act as they did in issuing the contested regulations. It is in the public interest that this court issue appropriate declaratory relief resolving the conflict between the parties and avoiding future actions or procedures contrary to law.

■ 3. We conclude that § 8e–1 empowers the Secretary of Agriculture to adopt restrictions applicable to imported tomatoes which are contained in the marketing orders governing domestic tomatoes, even though these restrictions do not relate to quality, and instead relate to matters, here size, which are designed solely to reduce the quantities of tomatoes entering the market.

Although Congress did not provide authority to impose limits on quantity of imports as such, its intention in its 1954 addition of § 8e–1 to the Act comprehended the application of grade and size restrictions that would operate to limit quantities. This is clear from the language of the section and its history. Insofar as relevant the provision for import restrictions on tomatoes, avocadoes and other specified commodities (7 U.S.C. § 608e–1) directs that—

> whenever a marketing order issued by the Secretary of Agriculture pursuant to section 608c of this title contains any terms or conditions regulating the grade, size, quality, or maturity of tomatoes * * * produced in the United States the importation into the

2. Plaintiffs Walter Holm & Company and William Wright, Inc., are Arizona corporations, each holding a license issued by the Secretary to act as commission merchants, dealer and broker, within the meaning of the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a ff. The other plaintiff, West Mexico Vegetable Distributors Association, suing on its own behalf and on behalf of its members, alleges that its office is in Arizona, and that its 40 members, all with principal offices in the United States, import more than 90% of the tomatoes imported into the United States from Mexico.

3. Southern Pacific Terminal Co. v. ICC, 219 U.S. 498. 31 S.Ct. 279, 55 L.Ed. 310 (1911); Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 36, 420 F.2d 597, 604 (1969).

4. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Harry H. Price & Sons, Inc. v. Hardin, 425 F.2d 1137 (5th Cir. 1970), cert. denied, 400 U.S. 1009, 91 S.Ct. 568, 27 L.Ed.2d 622 (U.S., Jan. 19, 1971).

United States of any such commodity * * * during the period of time such order is in effect shall be prohibited unless it complies with the grade, size, quality, and maturity provisions of such order or comparable restrictions promulgated hereunder.

The Government's brief puts the matter succinctly, stating (at 14), "Thus, Section 608e–1 authorizes what might be termed 'trade barriers' to the importation of foreign agricultural products, so long as the Secretary has imposed the same or comparable trade barriers upon domestic products."

The Act was passed in 1937 to insure that American farmers receive a satisfactory price for their commodities by removing the obstacle of market supplies far in excess of quantities sufficient to meet an effective consumer demand. S. Rep.No.1101, 74th Cong., 1st Sess. 1, 11 (1935). The mechanism provided by 7 U.S.C. § 608c is the issuance of marketing orders, which may, under subsection (6), contain terms "(A) Limiting, or providing methods for the limitation of, the total quantity of any such commodity or product, or of any grade, size, or quality thereof, produced during any specified period or periods, which may be marketed in or transported to any or all markets * * * by all handlers thereof." The passage in 1954 of the amendment limiting imports, referred to as the "golden rule" amendment, 7 U.S.C. § 608e–1, was to prevent frustration of the regulatory goal if quantities sent to market were limited by the regulated domestic handlers while importers could flood the market without regard to domestic requirements. The intent was to prevent imports from nullifying the effort of a marketing order to achieve a desired equilibrium between supply and demand in the marketplace. See statement of Senator Payne, 100 Cong.Rec. 13872 (Aug. 10, 1954).[5]

While Congress did not include in § 8e–1 authority to impose a direct limitation on "quantity" marketed, such as might be contained in domestic marketing orders, it is plain that Congress understood that the effect of applying grade and size restrictions could be to limit the relative quantities of imports.

4. The importers argue in the alternative that even assuming § 8e–1 permits imposition of grade and size restrictions as well as quality restrictions, the Secretary's discretion under this section is confined by virtue of § 22 of the Agricultural Adjustment Act of 1935, 7 U.S.C. § 624, as amended, which was added in 1940 and authorized the President to impose import fees or quotas on imported agricultural commodities after following prescribed procedures.[6] The authority granted the Secretary of Agriculture in 1954 for the commodities specified by § 608e–1 is separate from and exists in addition to the authority previously given to the President under § 624 in the case of all agricultural commodities where imports threaten programs of the Department of Agriculture. The separateness of these two sources of authority over imports is clear from the fact that § 608e–1 did not vest in the Secretary the authority to exercise over imports the authority to impose quotas that he had with respect to domestic production; thus authority to impose quotas on imports is left with the President under 7 U.S.C. § 624. These separate sources of power may be invoked separately. In the case of the specified commodities subject to § 608e–1 the Secretary has the

---

5. Senator Holland put it (115 Cong.Rec. 4383, Feb. 25, 1969): "The producers of many fresh fruits and vegetables in this country think that if they regulate themselves—by a marketing agreement supplemented by a Federal marketing order—in such a way as to confine their shipment to the fresh fruit and vegetable trade of their products of certain quality, maturity, grades and sizes, certainly it is not asking too much that suppliers of the same products from outside of our Nation should live up to the same standards."

6. It has been held that the President does not have authority to proclaim both an import fee and a quota with respect to the same commodity. United States v. Best Foods, Inc., 47 C.C.P.A. (Customs) 163 (1960), discussed in Metzger and Musrey, Judicial Review of Tariff Commission Actions and Proceedings, 56 Cornell L.Rev. 285, 336–339 (1971).

discretion whether to proceed by use of his own powers under that section to impose restrictions on imports other than fees or quotas, provided the same or comparable restrictions are in effect on domestic commodities, or to recommend to the President the imposition of import fees or quotas on imports.

■ In appropriate cases the Secretary may determine to use his own powers first, and to call on the President only if it proves necessary to have recourse to the powers provided by 7 U.S.C. § 624. The Secretary's discretion to use the powers provided by § 608e–1 is not narrowed or curtailed by the availability of a separate authority in the President under § 624. Philadelphia TV Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 359 F.2d 282 (1966).

5. Plaintiffs attack the substantive legality of the size provisions of the regulations. The marketing regulation prohibited the handling of tomatoes that did not meet minimum grade (U.S. #3 or better) or minimum size—over 2%2 inches in diameter for "mature green" tomatoes, and over 2¹⅞₂ inches for "all other" tomatoes. This ¼ inch in diameter seems to be critical, and results in exclusion of a large volume of the other tomatoes. The category of "all other" tomatoes, includes "breakers" that are predominantly green but have a blush of color. The category of "all other" tomatoes is sometimes called "vine ripe," which account for the bulk of those marketed, or "pinks."

In order to provide a justification for the validity of the size restriction in the domestic marketing regulation, and thus establish a predicate permitting the transfer of the same restriction into the import regulation, the Secretary proceeded on the premise that these different size restrictions "equalized the burden" between producers of mature green and vine-ripe tomatoes so that they withhold approximately the same percentages from market. Plaintiffs say the facts do not support that premise. We are inclined to agree that summary judgment on the ground that there was no ma-

terial dispute of fact on this issue was not warranted by the state of the record before us.

More important is the question of whether and to what extent the Secretary, in approving the issuance of a regulation couched in terms of domestic marketing restrictions, was really approving provisions that had relatively little significance in regard to the domestic industry, but were predominantly devised to discriminate against imports.

It is also claimed that the regulations as issued were not consistent with Article XI of the General Agreement on Tariffs and Trade (GATT), 61 Stat., Part V, p. A5 (October 30, 1947), and also that different restrictions were required in order to accommodate the objectives of GATT and of the Agricultural Marketing Act (including the "golden rule" amendment of § 8e–1).

We do not speak to any of these matters substantively because they may come to have a different cast, in terms of the approach of the Secretary and the illumination that will be provided if court review is sought, if his determinations are made following the procedure to which the importers are entitled.

6. Section 8c, 7 U.S.C. § 608c, imposes notice and hearing requirements as a condition of the issuance of marketing orders. There was such notice and hearing in 1955, when the Secretary included in the Florida marketing order for tomatoes a provision that included a method for limiting shipments through the issuance of marketing regulations (20 F.R. 7357, now codified in 7 C.F.R. 966.52).

The Order provides:

§ 966.52. Issuance of Regulations.

The Secretary shall limit the handling of tomatoes whenever he finds from the recommendation and information submitted by the Committee, or from other available information, that such regulation would tend to effectuate the declared policy of the act. Such regulation may:

\*        \*        \*        \*        \*

(c) Limit the handling of tomatoes by establishing, in terms of grades,

sizes, or both, minimum standards of quality and maturity; or * * *.

The "Committee" referred to is the Florida Tomato Committee, established by other provisions of the same Order, pursuant to § 608c(7) (C). The Secretary selects this committee, made up of members of the Florida tomato industry, from nominations by handlers in the marketing area, as his agency to administer the terms of the Marketing Order.

There is no requirement in the Order of opportunity for hearing prior to the issuance of regulations under 7 C.F.R. § 966.52. The Committee proposed the tomato-size regulations in question after holding meetings which were open to the public and at which plaintiffs expressed views. Invitations to attend were extended to representatives of the Mexican Government.

As to hearings before the Department, its officials considered the procedure required for issuance of the tomato-size regulations controlled by the provisions of the Administrative Procedure Act relating to rulemaking, 5 U.S.C. § 553. On receiving the Committee's proposal for a rule, the Secretary issued a notice of proposed rulemaking, inviting comments by all persons "who desire to submit written data, views, or arguments with respect to this proposal." 35 F.R. 105. Plaintiffs filed a brief and a petition requesting a hearing in Washington. The decision adopting the size regulation proposed by the Committee, issued by defendant Hedlund (*supra,* note 1) February 17, 1970, 35 F.R. 3159, stated that 5 U.S.C. § 553(b) does not require opportunity for oral presentation and continued:

"Frequently time is of the essence in amending regulations under fruit and vegetable marketing orders because of the rapid fluctuations in the supply and demand of these commodities and resultant effect on returns to producers. Rule making procedure providing for the submission of written data, views, or arguments is the most appropriate type of proceeding for such regulations since it requires less time to go through the proceeding than an oral hearing but nevertheless provides all interested persons a convenient opportunity to submit to the Secretary their data, views, or arguments on the proposal. In any event, however, subpenas would not be available for an oral hearing since the Secretary does not have subpena power in this type of proceeding. Accordingly the request for oral hearing is denied."

Because of adverse weather conditions and consequent decline in shipments of Florida tomatoes in February and March, these regulations were delayed on two occasions. 35 F.R. 3798, 35 F.R. 4546. When shipments increased in April and were projected for further increase in May, the regulations and size requirements were made effective April 27, 1970.

7. Before we consider further the issue of procedures, we take note, without findings, of what it is that plaintiffs claim. They contend the increase in size required for all tomatoes other than "mature green" tomatoes is unfair and represents nothing more than an arrow aimed at imports. They say the reality is that domestic producers can shift, with little burden, to marketing of "mature green" tomatoes, even so far as the same plant and marketing season is concerned, and have their tomatoes inspected green in the packing houses near the field, whereas producers and importers of Mexican tomatoes cannot feasibly arrange for "mature green" tomatoes at the border, bearing in mind that this classification precludes even a blush of pink color. Some 96% of imported tomatoes are in the "all other" classification.

The importers further say that the reality that the limitation from the minimum size provision would be borne disproportionately by imported tomatoes is borne out by the tape recordings of the meetings, which they obtained from the Department in the course of litigation, and reduced to transcript, but these references are not indicated in the minutes of committee meetings. They also claim that the Department officials gave no independent judgment to these matters, and

indeed had no pertinent evidence at hand of the relative significance of the size restrictions, but instead in effect abdicated the decision-making function to the industry committee and relied on the so-called expertise of its members. This was allegedly done by the Agriculture officials on the basis that since domestic producers raised both green tomatoes and vine ripes, they were in a position to arrive at an appropriate size differential as between greens and vine ripes. But the deference of the Agriculture officials to the industry desires was inappropriate, the importers contend, because the provision set forth by the domestic committee represented an effort to impose undue and discriminatory burdens on the kind of tomatoes that must be used for imports.

8. As to legal requirements concerning procedure, plaintiffs argue that a hearing was required prior to the issuance of the size regulations, and not mere opportunity to file written comment, because they were an "order" which under § 8c must be preceded by notice and opportunity for hearing, under the express provisions of § 8c, subsections (3), (4) and (17). They point out that § 8e–1 expressly provides "whenever a marketing *order* issued by the Secretary" pursuant to § 8c contains terms regulating the size of tomatoes produced in the United States, the importation is prohibited unless it complies with such size restrictions. The requirement of an "order" as a precedent to import restrictions is urged to require the notice and opportunity for hearing required for an "order" under § 8c.

The Government argues that the Marketing Order provides for size restrictions effective for domestic tomatoes although the size restrictions were set forth in implementing regulations issued pursuant to the order.

We are disinclined to any interpretation that would consider that each and every change as to domestic producers that becomes applicable to imported commodities must be accompanied by an order, or amendment of order, that requires the opportunity for hearing specified in § 8c for orders. The necessities of meaningful regulation, especially as to fresh fruits and vegetables, make it unlikely that this was mechanically required by Congress. On the other hand, it is equally untenable that the requirement of hearing prior to "order" spelled out in § 8c, could be aborted by a provision in an order stating that all policy decisions hereafter would be taken by "regulation" providing opportunity only for written comments.

This is not an area that may rightly be approached in terms of absolute rigidity of requirement. It is not the law that all orders must be preceded by oral hearings when hearing is sought only on matters not involving material issues of fact. Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 414 F.2d 1125 (1969); Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 420 F.2d 577 (1969). And it is not the case that all administrative actions legitimately denominated regulations are *ipso facto* freed from any need for oral hearings. Londoner v. Denver, 210 U.S. 373, 385–386, 28 S.Ct. 708, 52 L.Ed. 1103 (1908); American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 317–318, 359 F.2d 624, 631–632 (*en banc*), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

The kind of procedure required must take into account the kind of questions involved. In this case we have a tie of restrictions on domestic producers to restriction on imports, issues of foreign policy involved in any decision importantly affecting imports, the need to consider the intention and effect of GATT and the Government's policy with respect to GATT whether or not GATT is mandatorily prohibitive. We discern that it lies within the Congressional intention that the handlers of imported commodities have an effective opportunity to make a presentation to the Secretary on crucial issues. It is significant that § 8e–1 imposes a restriction on imports only when a like restriction applies to domestic production by virtue of an "order" under § 8c, even though it cannot be carried to the extreme of requiring an oral hearing each time there

is a change in the domestic restriction that generates a change in the restriction on imported commodities.

This conclusion is undergirded by basic considerations of fairness arising out of the framework of the restriction, a statutory pattern of self-regulation by industry, and an assertion not palpably devoid of substance that the approach of the domestic producers to the factual issue, which would normally be given deference by the Secretary, is in fact a rationalized determination of a discrimination against importers. The issue does not turn on such pejorative terms, used by plaintiffs, as "abdication" to industry regulation. The essential point is that a procedure not requiring an opportunity for oral presentation to the Department on crucial matters, and not requiring evidence in the record, is a seed bed for the weed of industry domination. When the Secretary comes himself to make a determination of crucial facts and conclusions, he must think in terms of support in evidence and general standards, and cannot be guided solely by deference to industry desires. Fairmont Foods, Inc v. Hardin, 143 U.S.App.D.C. 40, 442 F.2d 762 (Feb. 1971).

We think the kind of underlying issue, involving as it does imports and the need for coordination with Government foreign policy, and the issue of fairness which we have discussed, combine to require that on those matters where importers make a not insubstantial claim that an effective showing requires oral presentation to Department officials, that this right is available to them. *American Airlines* indicates that the oral hearing may be legislative in type, although fairness may require an opportunity for cross-examination on the crucial issues. This requirement of hearing is not shackled by rigidities of procedure that may stultify the regulatory program. What counts is the reality of an opportunity to submit an effective presentation, to assure that the Secretary and his assistants will take a hard look at the problems in the light of those submissions. Once the Secretary has made a judgment on the crucial issues on the basis of such a procedure, there is more room to project that future application of the same policy may be wrought by regulations issued after opportunity to file written comment.

The procedure providing effective oral presentation can be carried out with expedition. Marine Space Enclosures v. FMC, *supra*. If necessary, there may well be room for a temporary determination by the Secretary *pendente lite*, on grounds of emergency, pending the time needed for effective oral presentation. Fairness in the conduct of government may be developed without undermining the capacity to govern. The reasonableness of limited *pendente lite* approach appears from familiar operations of the courts, and also from executive and administrative matters where Congress has authorized temporary certificates of public convenience and necessity in case of emergency.[7] Indeed, Congress inserted a provision in § 22, 7 U.S.C. § 624, which permits emergency determinations by the President without a hearing pending the holding of the hearing on imports of commodities.

■ There is no statutory provision for "temporary" orders under § 8c. But an order issued under § 8c after full hearing may reasonably provide for further implementation (a) in part by regulations issued only after opportunity to comment, and (b) as to novel or crucial matters, by regulations issued only after opportunity for effective oral presentation subject to provision, when needed, of temporary regulation, in the interim, on the basis of the comments preceding oral presentation.

The District Court judgment is modified to declare that plaintiffs have procedural rights in regard to regulations issued under the Florida Tomato Order as set forth in this opinion. As so modified the judgment is affirmed.

So ordered.

---

7. Pennsylvania Gas & Water Co. v. FPC, 138 U.S.App.D.C. 298, 427 F.2d 568 (1970).