APPALACHIAN POWER COM-
PANY et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

APPALACHIAN POWER COM-
PANY, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

BETHLEHEM STEEL CORPORA-
TION, Petitioner,

v.

William D. RUCKELSHAUS, Administra-
tor, and Environmental Protection
Agency, Respondent.

Nos. 72-1733, 72-1734, and 72-1776.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 5, 1972.

Decided April 11, 1973.

H. Edward Dunkelberger, Jr., Washington, D. C. (Theodore L. Garrett,

Washington, D. C., Charles C. Wise, Jr., and Thomas C. Damewood, Charleston, W. Va., on brief), for petitioners in Action Nos. 72–1733 and 72–1734.

H. Vernon Eney and Thomas P. Perkins, III, Baltimore, Md. (Anthony M. Carey, Robert G. Smith and Venable, Baetjer & Howard, Baltimore, Md., on brief), for petitioner in Action No. 72–1776.

James R. Moore, Atty., U. S. Dept. of Justice (Kent Frizzell, Asst. Atty. Gen., Edmund B. Clark and Martin Green, Attys., U. S. Dept. of Justice, on brief), for respondents in Action Nos. 72–1733, 72–1734 and 72–1776.

Before RUSSELL, FIELD and WIDENER, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

These proceedings arose under the Clean Air Act Amendments of 1970,[1] which represented a drastic revision of earlier federal air quality control legislation.[2] In enacting the Amendments, Congress was seeking to "make possible the more expeditious imposition (and enforcement both nationally and locally) of specific emission standards" for air pollutants by substantial revisions in the "cumbersome and time-consuming procedures" of the earlier statutes in the field.[3] To achieve this purpose, it sought to involve both state and federal governments by establishing two methods of control, one federal and one state, each complementary of the other, and the two combining and cooperating to assure a healthy air environment throughout the nation under plans specially adapted to the unique conditions of the various states.[4] By national action the Amendments proposed to regulate the amount of pollution in the ambient air and by state action it sought to control the amount of polluting emissions at their source.[5]

The federal agency charged with responsibility under the Amendments was the Environmental Protection Agency. The first responsibility of the Administrator of such Agency is to prepare, from time to time, a list of all air pollutants which have an adverse effect on public health or welfare and to issue air quality criteria for these pollutants, reflecting "the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant[s] in the ambient air, in varying quantities."[6] He is then directed by the Amendments to promulgate national primary and secondary ambient air quality standards for each air pollutant for which air quality criteria had been issued.[7] In the promulgation of these national standards, the Administrator, it is argued, is to be

---

1. Section 1857c–2 et seq. 42 U.S.C.

2. The history of federal clean air legislation is detailed in 116 Cong.Rec., 91st Congress, 2d Sess., p. S16103 (daily ed. Sept. 21, 1970) ; see, also, Note, Clean Air Act Amendments of 1970: A Congressional Cosmetic, 61 Geo.L.J. 153, 154–6 (1972).

3. See H.Rept. No. 91–1146, 91st Cong., 2d Sess., (1970), U.S.Code Cong. & Admin. News, p. 5360 (1970) ; Kennecott Copper Corp. v. Environmental Protection Agcy. (D.C.Cir. 1972), 462 F.2d 846, 849.

4. Note, Clean Air Act Amendments of 1970: A Congressional Cosmetic, 61 Geo. L.J. 153, 159 (1972) :
"The Clean Air Act Amendments of 1970 represent a compromise between the need for effective national control and the desire to mold the air pollution program around state and local needs."

5. These proceedings are concerned with the control of air pollution from stationary sources. The Amendments also deal with moving sources but those provisions are not involved in the claims of the petitioners.

6. Section 1857c–3, 42 U.S.C.

7. Section 1857c–4, 42 U.S.C.
At the time of the enactment of the Amendments, criteria had been issued for six pollutants but it was stated in the Congressional debates that the Administration "is currently studying 30 different pollutants to determine their potential effects on health."
116 Cong.Rec., 91st Cong., 2d Sess., p. S16104 (daily ed., Sept. 21, 1970).

guided solely by health considerations.[8] He is, also, to issue regulations establishing federal standards of performance for all new stationary sources. Those standards were to be achieved through the use "of the best system of emission reduction which (taking into account the cost of achieving such reduction) the Administrator determines has been adequately demonstrated."[9] The states, on the other hand, are to formulate, after reasonable notice and public hearings, "implementation plans" establishing standards for the control within their borders of sources of pollution, which standards were to be sufficiently stringent to assure that the emission volume from all such sources within those areas did not exceed the national ambient air standards.[10] Stated somewhat differently, the Amendments provided that states, in preparing their own plans for control, could be as tough on polluters as they wished, but that no state could allow industry to exceed the federal standards on smoke and dust, carbon monoxide and other common pollutants.[11]

The state plan was to cover existing sources and to take into account new stationary and moving sources. It is expected that states, in exercising their authority under the Amendments, would consider local factors such as "meteorological conditions, topographical context, and economic and social demands."[12]

---

8. The House version had required the consideration of economic feasibility and costs in setting national ambient standards. The Senate version, which was later adopted, "deleted all wording as to economic feasibility and cost in setting national ambient standards which appear in the original bill with the single exception of new source performance standards." 61 Geo.L.J., *supra*, 179, n. 157. For the reasoning behind such deletion, see Kennecott Copper Corp. v. Environmental Protection Agcy., *supra*, at 850, n. 16 (462 F.2d).

9. Section 1857c-6, 42 U.S.C.

10. The effectiveness of this program of joint control has been seriously questioned. In 61 Geo.L.J., *supra*, at 161, n. 57, it is observed:
   "Derivation of emission standards from ambient standards, while determined by complex computer programming, ultimately rests on assumptions, which, if incorrect, undermine the entire control program."
   *See, also*, the testimony of Sussman, Director, Bureau of Air Quality and Noise Control, Pennsylvania Department of Environmental Resources at the Hearings, Senate Subcommittee on Air and Water Pollution, Committee of Public Works, 92d Cong., 2d Sess. (1972), at 719.

11. One commentator has stated that this requirement of federal approval of state implementation plans "was intended to cramp the style of authorities that might be inclined to wink at pollution for the sake of attracting industry and expanding their local economies." 246, The Economist (London), at 23 (January 20, 1973).

12. 61 Geo.L.J., *supra*, at 157.
   *See, also*, Baum, The Federal Program for Air Quality, 5 National Resources Lawyer 165, 169 (1972):
   "But, as I said, when the ambient air quality standards were promulgated, there was no consideration given to economics or feasibility. It is at the implementation plan stage that a state will consider these things. In devising their control strategy, the states will determine who can do what, how much it is going to cost, if we should require sixty per cent reduction for this industry and forty per cent for this one or vice versa, and when these things will be applied."
   Mr. Baum is Assistant General Counsel of EPA. He also prepared for the Administrator a memorandum submitted to the Senate Oversight Committee, in which this statement is made with reference to state plans:
   "It was expected that, at the (state) hearings, persons responsible for adoption of the plan would be made aware of the feasibility and impact of various possible strategies on all segments of the public. To expect States to evaluate the impact of various alternatives open to them without considering the economic and social impact of their decisions would deprive them of the flexibility and initiative Congress intended that they retain." Hearings, Senate Subcommittee on Air and Water Pollution, Committee on Public Works, 92d Cong., 2d Sess. (1972), at 312. *See,*

They are expected, also, to give consideration to control technology and economic factors.[13] Any state implementation plan, however, has to be submitted to the Administrator for approval. The approval of the Administrator requires, *inter alia*, a finding by him that the plan provided for the attainment of the national primary ambient standards—based on health—within three years, and of the secondary standards—based on welfare—within a reasonable time.[14]

Judicial review of the action of the Administrator in approving or disapproving a state plan is authorized before the Circuit Court of Appeals for the Circuit in which the state submitting the plan is located. Application for such judicial review is to be filed within thirty days from the date of the Administrator's approval. Unless reversed on such review, the state implementation plan remains enforceable as federal law under procedures spelt out in the Amendments and is not "subject to judicial review in [federal] civil or criminal proceedings for enforcement." [15]

The petitioners are all seeking judicial review of the approval by the Administrator of a state implementation plan submitted under the Amendments. In two of the proceedings, the operators of electric generating plants assail the approval of plans submitted by the States of West Virginia and Virginia. In the third proceeding, Bethlehem Steel Corporation challenges the approval of the plan of the State of Maryland. In approving the state plans involved in all three proceedings, the Administrator held no "hearings", *i. e.*, he granted no opportunity, after public notice, for either comment or testimony on the proposed state plans. Interested parties had, however, been given notice and hearing before the state authorities on the state plans under review. The Administrator did not file, in connection with his approval, either an environmental impact statement or a finding that one was unnecessary.[16]

The matter presently before us does not concern the merits of the petitioners' challenge to the Administrator's ac-

---

*also*, p. 308 of same Hearings under heading "Economic Feasibility."

Senator Cooper, in explaining the provision for state plans, said:

"And these plans must accomplish the air quality standards within 3 years. It is at this point that States and communities must make economic decisions, and decisions on the future growth of their areas and the kind of life they want, in considering alternative means of achieving clean air." 116 Cong.Rec., 91st Cong., 2d Sess., at S16107.

13. New sources required consideration of *both* economic and technological factors. As Sussman, Director, Bureau of Air Quality and Noise Control, Pennsylvania Department of Environmental Resources, has observed, however, "It is obvious that these standards (of 'the best available *technology*') will be incorporated in state regulations for existing sources (especially since federal regulations will cover 'modifications' to existing sources)." Hearings, Senate Subcommittee on Air and Water Pollution, Committee of Public Works, 92d Cong., 2d Sess. (1972), at 719.

14. It was held in Sierra Club v. Ruckelshaus (D.C.Cir. 1972), filed November 1,

1972, cert. granted 93 S.Ct. 941, that the Administrator could not approve any plan that permitted any degradation in the air quality in the state, without regard to whether its provisions were "adequate to prevent" any pollution exceeding the national standards.

15. 42 U.S.C. 1857h–5(b)(2).

This requirement that judicial review should follow immediately upon the Administrator's approval or disapproval of the plan and not when enforcement was sought represented a change from the House version of the Amendments. As initially adopted by the House, the Amendments provided for a judicial review, described in the House Report thus:

"The court may enter such judgment and orders as it deems necessary in the public interest and the equities of the case. In so doing the court must give due consideration to the practicability and to the technological and economic feasibility of complying with the provisions of the plan." U.S.Cong. & Admin.News, 91st Cong., 2d Sess., p. 5364.

16. *See* Section 1857h–7, 42 U.S.C.

tion. The petitioners, by motion, seek remand of the proceedings of approval to the Administrator with instructions that the Administrator provide, after notice, an evidentiary hearing on the approval or disapproval of the state plans and that he file an environmental impact statement in connection with his approval or disapproval. These motions present the issues presently before us. They represent largely procedural questions, though some elements of substance arise. Since all motions pose similar issues, we consolidated them for oral hearing and will dispose of them together.

■ The initial dispute between the parties centers on the nature or character of the Administrator's action or approval. The petitioners would catalogue that action as rulemaking, as defined in the Administrative Procedure Act, and subject to the hearing requirement fixed in that Act.[17] The Administrator, on the other hand, asserts that "Congress did not intend that this approval process be treated as traditional rulemaking, subject to APA requirements" of a hearing.[18] It is idle, and fruitless, to boggle over the appropriate classification of the Administrator's action, though we cannot avoid observing that the Administrator, in his order of approval, described his action as "rulemaking". Modern precedent has discarded such classifications as criteria for determining the type of hearing to which the parties affected by administrative action are entitled. The leading text on administrative law puts it that the "best solution of the problem of classifying borderline activities is to avoid classifying them * * * [I]f the problem is to determine appropriate procedure for a particular activity, the practical procedural needs may be studied without calling the activity either rule making or something else * * *."[19] Another commentator, who has described attempts at classifying administrative actions as formal, rulemaking or adjudicatory as "largely an unprofitable one," suggests that, "[T]he most constructive way to eliminate many of the inequities and inadequacies which appear from time to time in administrative proceedings is to pay less attention to theoretical, conceptual, and largely artificial lines between adjudication and rule making, and to devote more attention to the task of fashioning, out of the available arsenal of procedural techniques, hybrid modes of procedure most appropriate to the issues and circumstances of particular cases or classes of cases."[20] Following these principles, the firm direction of recent decisions is that "Procedural requirements (dealing with the requirement of hearings in administrative proceedings) depend in part

17. Section 551(4), 5 U.S.C. defines a rule as "an agency statement of general or particular applicability and future effect * * *." And Section 551(5), 5 U.S.C. defines rulemaking as an "agency process for formulating, amending, or repealing a rule." Rulemaking is "typically concerned with broad policy considerations rather than review of individual conduct." American Airlines v. Civil Aeronautics Board (1966), 123 U.S.App.D.C. 310, 359 F.2d 624, 629 cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75. It is generally contrasted with adjudication. The distinction between the two types is illustrated by classifying "any aspect of it [the administrative action] that declares generally applicable policy as 'rulemaking' and any aspect applying the policy to identified persons as 'adjudication'." Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 921, 924 (1965).

18. *See*, Section 553(b)(3)(B), 5 U.S.C.

19. 1 Davis, Administrative Law Treatise, sec. 5.01, at 286.

20. Clagett, Informal Action—Adjudication—Rule Making: Some Recent Developments in Federal Administrative Law, 1971 Duke L.J. 51, 53, 85; *see, also*, Boyer, Alternative to Administrative Trial Type Hearings for Resolving Complex Scientific, Economic and Social Issues, 71 Mich.L.Rev. 111, 112–4 (1972) ; Robinson, The Making of Administrative Policy: Another Look at Rule Making and Adjudication and Administrative Procedure Reform, 118 U.Pa.L.Rev. 485, 500 (1970).

on the importance of the issues before the agency"[21] and "The kind of procedure required must take into account the kind of questions involved."[22] Accordingly, if the resulting administrative action, whether regarded as rulemaking or otherwise, "is individual in impact and condemnatory in purpose"[23] or "when the issue presented is one which possesses great substantive importance, or one which is unusually complex or difficult to resolve on the basis of pleadings and argument,"[24] a hearing preceding any final administrative action is appropriate.[25] On the other hand, if a public hearing would appear unnecessary, either because of other available procedures[26] or because the proceeding presents "only a question of law without any dispute on the facts"[27] or "the ultimate decision will not be enhanced or assisted by the receipt of evidence,"[28] a prior hearing may be dispensed with.[29]

Naturally, the parties differ sharply in their construction of both the power and the effect of the Administrator's approval. The petitioners which are operating electric generating plants state that the plans challenged by them, if enforced, will require the closing of their steam generating plants and the petitioner Steel Company asserts that the enforcement will compel it to incur large expenses which will result in no real diminution in either air or smoke pollution in its plant. It is the petitioners' construction of the Amendments that not simply the state authorities but also the Administrator, in his evaluation and approval of the state plans, must consider, among other factors, the technological and economic feasibility of those provisions of the state plan which impose such onerous and "condemnatory" burdens on them. For these reasons, they urge that they should be accorded a right to be heard by the Administrator in an evidentiary proceeding.[30] The

21. Marine Space Enclosures, Inc. v. Federal Maritime Com'n. (1969) 137 U.S. App.D.C. 9, 420 F.2d 577, 586, n. 22.

22. Walter Holm & Company v. Hardin (1971), 145 U.S.App.D.C. 347, 449 F.2d 1009, 1015.

23. American Airlines, Inc., v. Civil Aeronautics Board, supra, at 631 of 359 F.2d.

24. National Air Carrier Association v. C. A.B. (1970), 141 U.S.App.D.C. 31, 436 F.2d 185, 191.

25. International Harvester Co. v. Ruckelshaus, (D.C.Cir. 1973), 478 F.2d 615.

26. Retail Store Employees U., Local 880, R.C.I.A. v. F.C.C. (1970), 141 U.S.App. D.C. 94, 436 F.2d 248, 254–255, n. 39.

27. Citizens for Allegan County, Inc. v. Federal Power Com'n. (1969), 134 U.S. App.D.C. 229, 414 F.2d 1125, 1128.

28. City of Lafayette, Louisiana v. Securities & Exch. Com'n. (1971), 147 U.S. App.D.C. 98, 454 F.2d 941, 953.

29. An illustration of such a procedure exists in these very Amendments. In Kennecott Copper Corp. v. Environmental Protection Agcy., supra, 462 F.2d 850, n. 16, the Court said:

" * * * The legislative history of the 'Clean Air Amendments of 1970' (Pub.L. 91–604) makes it clear that

Congress felt public hearings on the national standards were unnecessary in light of the implementation plan hearings and would unduly delay achievement of air quality protective of the public health and welfare * * *".

See, also, Citizens for Allegan County, Inc. v. Federal Power Com'n., supra, at 1128 of 414 F.2d in which the Court said that "the right of opportunity for hearing does not require a procedure that will be empty sound and show, signifying nothing. The precedents establish, for example, that no evidentiary hearing is required where there is no dispute on the facts and the agency proceeding involves only a question of law."

30. "The right to a full trial-type hearing in administrative proceedings is generally limited to the situation where adjudicatory facts—that is, facts pertaining to a particular party—are in issue." Note, Federal Administrative Law Developments—1971, Duke L.J., (1972) 115, 171, n. 24. However, it is the recent rule that classifications such as rulemaking (as distinguished from adjudication) do not automatically foreclose a right to an evidentiary hearing. It is the basic scope of the proceeding, rather than its classification, that determines the right.

Administrator, however, would find no need for a hearing by him on the state plans. In the first place, under his construction of his function, a hearing at his level would be unnecessary because of the prior opportunity of the parties to be heard before the state authority. The Administrator, also, justified his failure to accord a hearing on the ground that he had published, prior to promulgation, "as a notice of proposed rulemaking", his guidelines to be issued to the state authorities in connection with the preparation of the state plans, with appropriate opportunity for comment by interested parties. 40 C.F.R., Part 51. These guidelines, however, instructed the state authorities to consider technological and economic factors. We apprehend that it is the failure to consider such factors that constitutes the basis of petitioners' attack. The petitioners, we feel sure, have no complaint with the guidelines; their complaint is that the plan as finally approved did not give the proper weight to the technological and economic factors that the guidelines commanded. The failure of the petitioners to object to the guidelines would constitute no basis for a denial of a right of hearing by the Administrator on the subsequently developed state plans, which the petitioners may well claim violated such guidelines, and we shall not further consider such failure in connection with the Administrator's position on the issues.

We are, however, disposed to agree with the Administrator that, if the state hearings were adequate, he was not required, prior to approving the state plans, to extend to the petitioners or other interested parties, an opportunity to be heard. An opportunity to be heard on the proposed state plans had presumably already been given all interested parties, after appropriate notice, by the respective state authorities. It is to be presumed that at such hearings all objectors had a reasonable opportunity to present, *in an appropriate type of hearing*, their objections to the proposed plans. To provide them a second opportunity merely to reiterate the claims made by them before the state authority, at a hearing before the Administrator, would normally be a useless exercise wasteful and time-consuming and "unnecessary", whether the Administrator's action be deemed "rulemaking" or otherwise.[31] It would seem particularly unwarranted, too, in a situation, where Congress had determined that expedition was demanded by urgent considerations of health and the general welfare. That Congress intended that such a hearing before the Administrator on the state plan was to be avoided in the interest of expediting action is persuasively suggested by the statutory language. Thus, the Amendments in express words enjoin the state authorities to afford, after notice, a hearing to all interested parties, but, in providing for the subsequent approval by the Administrator, it omitted any prior hearing requirement. This omission would seem to have been purposeful, in keeping with the Congressional intent to expedite the promulgation of state enforcement plans, without encumbering the administrative procedures with two hearings on the same plan.[32] That this was so, the Ad-

---

31. *Cf.*, Retail Store Employees U., Local 880, R.C.I.A. v. F.C.C., *supra*, at 254–255, n. 39 of 436 F.2d.

"We recognize, however, that when one federal agency has rejected factual charges after an adequate investigation a sister agency may be entitled to rely upon the prior investigation in dismissing factually identical allegations without hearing * * * *"

32. *Cf.*, Law Motor Freight, Inc. v. C.A.B. (1st Cir. 1966) 364 F.2d 139, 144, cert.

denied 387 U.S. 905, 87 S.Ct. 1683, 18 L.Ed.2d 622.

"Section 403(a) of the Federal Aviation Act, 49 U.S.C. § 1373(a), does not require a hearing, although other sections do. With such a statutory configuration, the clear indication is that the legislative omission was significant."

The petitioners, however, urge that no particular inference of Congressional intent is to be drawn from the omission of any requirement of a hearing before the Administrator on the approval of a

ministrator found confirmed, since, under the other provisions of the Amendments, there was "no practical way that the rulemaking procedures of the Administrative Procedure Act [covering hearings preliminary to administrative actions] could be followed if the statutory time-table [for the promulgation and approval of state implementation plans under the Amendments] was to be observed." We think it plain that Congress regarded the right to a public hearing, prior to adoption of the plan, satisfied by the hearing guaranteed before the state authority, and in the interest of expediting the promulgation of an effective state plan, dispensed with a hearing before the Administrator. In effect, Congress made a finding, which the Administrator merely confirmed in his order, that, under these circumstances, a hearing at the Administrator's level was both "impractical" and "unnecessary." That finding met the requirements of Section 553(b)(3)(B), 5 U.S. C.A., exempting certain rulemaking proceedings from any requirement of a hearing, if, as the petitioners argue, that Act is applicable to the Administrator's action.

■ This conclusion, however, is based on the assumption that at the state hearing interested parties were afforded full opportunity to present their contentions with respect to the proposed plan. Because of the nature of the regulations and their drastic impact, such opportunity might well include the right to more than merely the opportunity to comment. See International Harvester Co. v. Ruckelshaus (D.C.Cir.1973) 478

F.2d 615, at 630–631. What is required in all instances, whatever the character of the administrative action, is "the reality of an opportunity to submit an effective presentation," and, if in the context of the issues involved, "cross-examination on the crucial issues" is found proper, such right should be recognized and upheld. Walter Holm & Company v. Hardin (1971), 145 U.S.App.D.C. 347, 449 F.2d 1009, 1016.[32a] The record of those state hearings has not been as yet certified to this Court and it is not possible for us to determine whether those hearings provided the petitioners with the type of hearing the importance of their rights required. Should it appear, after the state hearings have been certified to this Court, that an adequate right of hearing at the state level was not afforded the petitioners, a motion to remand as requested by the petitioners might be in order.

■ There remains the question whether, under due process, the state hearing (assuming its adequacy) would be a valid justification for the Administrator's failure to afford a hearing on his part prior to his approval of the state plans. This generally turns on the traditional balancing of public and private interests, though, again, some courts would resolve it in terms of whether the administrative action is adjudicative, i. e., is directed at an identifiable party. Note, Federal Administrative Law Developments—1971, Duke L. J. (1972), *supra*, at 158–67; cf., Langevin v. Chenango Court, Inc. (2d Cir. 1971) 447 F.2d 296, 300. As expressed in the Amendments,

state plan, and they would find a perfectly plausible explanation for the inclusion of an express provision for such hearing in the proceedings before the state authority and the omission of such requirement in the proceedings before the Administrator. They state that it was necessary for the Amendments to provide expressly for a public hearing in connection with the state proceedings but there was no such necessity at the federal level in view of the positive command of the Administrative Procedure Act requiring a hearing in *all federal administrative proceedings* where there was no *express* provision to the con-

trary. It is true, as the petitioners suggest, that the Amendments include no *express* provision justifying the denial of a hearing in connection with the Administrator's approval of the state plan. But we find, as did the Court in *Law*, a very plain Congressional intent, which we are disposed to respect.

32a. An excellent statement of the reasons for this requirement of a hearing before administrative action, is set forth in Bonfield, Military and Foreign Affairs Function Rule-Making Under the APA, 71 Mich.L.Rev. 222–4 (1972).

Congress found that air pollution represents a present danger to human health and required urgent governmental action. For that reason, it sought to expedite, as far as it validly could, the delays that might result from unnecessary administrative proceedings in achieving effective regulation of air pollution at both national and state levels. It is fair to infer that Congress felt that, by affording interested parties an adequate opportunity for a hearing before the state authority on the state plan which was eventually to be reviewed by the Administrator, it had met the requirements of due process. *Assuming that the state hearings were adequate and that the Administrator, in the course of his own evaluation of the state plans, reviewed those state hearings,*[33] we are inclined, on balance, to conclude that the procedures followed by the Administrator accorded with due process.

■ While perhaps not at issue now, it might be indicated that, even though the Administrator may have been authorized (subject to the *caveats* already indicated) to dispense with a hearing before him on the state plans, this in no way precludes or prejudices the right of the petitioners, under proper circumstances, to move before this Court for an opportunity to adduce additional evidence. In Citizens to Preserve Overton Park v. Volpe (1971) 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 for instance, it was held that the Secretary of Transportation was not bound to hold a public hearing prior to his administrative action in those proceedings (which action, incidentally, the Court found to be "plainly not a rulemaking function") but, nonetheless, as an incident of judicial review of that action, the Court found that a hearing was necessary.[34] As a matter of fact, the Amendments with which we are concerned expressly provide that, in connection with judicial review of the order of approval of a state plan by the Administrator, the reviewing court may remand the proceedings to the Administrator to take additional testimony "in such manner and upon such terms and conditions as to the court may deem [*sic*] proper," upon a showing by the moving parties that "such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator." Section 1857h-5(c), 42 U.S.C.;[35] Getty Oil Company v. Ruckelshaus (3d Cir. 1972) 467 F.2d 349, 357.

■ Whether the petitioners would be entitled to an order to remand to the Administrator to receive additional testimony in connection with judicial review would depend largely on the issues to be resolved in that review. The Amendments, in authorizing judicial review, do not prescribe in specific terms the scope of that review. In Getty Oil Company v. Ruckelshaus (D.C.Del.1972) 342 F.Supp. 1006, 1015, it was assumed that the review of the action of the Administrator

33. There is an intimation in the record—actually by the Administrator—that he does not review the hearings before the state authority and the presentations made thereat. This is contradictory to a substantial extent of his justification for a denial by him of a hearing and, in our judgment, would not accord with the legislative intent or with due process. A failure on his part to consider the state hearing record would mean that interested parties had had no hearing before him. Under those circumstances, the entire justification for a denial of a hearing before the Administrator would be undermined and it might well be that a court would be compelled to remand the proceedings for a hearing before the Administrator. For the moment and in connection with these motions as they now stand, we shall assume until otherwise established, after the certification of the entire record to this Court, that the Administrator did review the full state record.

34. *See, also,* Walter Holm & Company v. Hardin, *supra,* at 1015–1016 of 449 F.2d.

35. This Section corresponds with Section 2347(c), 28 U.S.C., applicable to proceedings before the Federal Communications Commission, the Federal Maritime Commission, the Atomic Energy Commission and orders of the Secretary of Agriculture.

in approving a state plan would encompass whether the determination was "arbitrary and unreasonable because unnecessary, uneconomic and ill-suited to the accomplishment of the objectives of the regulatory program." On appeal, the construction of the Court's scope of review under Section 307, as stated by the District Court, was apparently accepted as authorizing judicial review on the grounds that the approval or disapproval was wholly "arbitrary and unreasonable" and that, in considering such grounds, "questions of economic hardship or lack of compelling necessity" could be considered. Getty Oil Company v. Ruckelshaus, *supra*, at 355, 357 of 467 F.2d. These statements of the range of judicial review find support in Citizens to Preserve Overton Park v. Volpe, *supra*, 401 U.S. at 413–416, 91 S.Ct. 814, where, in construing the scope of judicial review under a statute in which, as here, that scope was not spelt out, the Court stated that the real issue on judicial review under such circumstances was whether the agency acted within the scope of its authority and whether the decision reached was arbitrary, capricious or otherwise not in accordance with law, and, in making such determination, the court should decide if the agency failed to consider all relevant factors in reaching its decision, or if the decision represented a clear error of judgment.[36] This is substantially the scope of review as authorized under the Administrative Procedure Act, Section 706, 5 U.S.C. It can be accepted as the proper formula to be applied in reviewing the action of the Administrator in these actions.

■ But the Administrator argues that, in the exercise of judicial review of his action in approving the state plans, the Court shall look simply to his order of approval and the state plan itself and make its determination on those two documents as the sole record in the case. He goes farther and asserts that his authority in this area is largely ministerial. It is suggested that he makes no review of either the economic or technological feasibility of the plan in exercising his power to approve or disapprove the state plan. He argues that, even if the Court concludes that it is not confined in its review to the Administrator's order and the state plan, it can go no farther in its review of his action than to consider (1) whether a hearing was had before the state authority and (2) whether the mathematical determination by the Administrator that the national standards will be achieved under the state plans is arbitrary and unreasonable. This is so, he says, because those are the sole matters considered and determined by the Administrator in his action. We take no such narrow view of either our own role in connection with the judicial review of the Administrator's action [37] or of the Administrator's role in evaluating the state plan in connection with his exercise of the power to approve or disapprove.

Certainly, the Administrator's connection with the proceedings before the state authority is considerably more intimate than he suggests and certainly may not fairly be characterized as substantially ministerial. At the outset he provided the state authorities with the guidelines to be used by them in preparing state plans and in identifying the factors to be weighed by them. And, in those guidelines, he admonished the state authorities that "nothing in this part shall be construed in any manner * * * to encourage a State to prepare, adopt or submit an implementation plan without taking into consideration * * * impact or availability of fuels, energy, transportation and employment." He went further in Regulations issued by

---

36. *See, also*, Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584.

37. *Cf.*, Environmental Defense Fund, Inc. v. Environmental Protection Agency

(1972) 150 U.S.App.D.C. 348, 465 F.2d 528, 540–541:
"Our own responsibility as a court is as a partner in the overall administrative process—acting with restraint, but providing supervision."

him and spelt out for them "the available technology" for control of air pollutants because, as he puts it, "some of the States do not have in their State control programs enough information on what is available technology." [38] He made available to the state agencies throughout the formulation of their state plans technological advice. In fact, one of the primary responsibilities of the Administrator was to conduct research in the field of air pollution and make it available to the state authorities. In order to keep himself informed of the manner in which the state authorities were proceeding, he required them to give him notice of all hearings so that, if he desired, he might have observers present. Section 51.4(b)(2), 40 C.F.R. And when he came to review and evaluate the state plan, he did not restrict his consideration to the state plan itself. In his Regulations, he provided that "the State shall prepare and retain, for inspection by the Administrator on his request, a record of each [state] hearing. The record shall contain, as a minimum, a list of witnesses with the text of each presentation." [39] Moreover, when the plans are submitted, the Administrator does not rely on his own staff or limit his consideration to matters within the expertise of his own agency. He submits the plans, as well, we assume, as the state hearings, for review to an interagency committee, composed of representatives of the Federal Power Commission, the Office of Transportation, the Office of Management and the Budget and perhaps other federal agencies. The representatives on this federal interagency committee sit, according to the Administrator, "on a committee * * * to *review the aggregate impact* of all of these implementation plans" (Emphasis added). He explained further the functions of this interagency committee in his testimony before the 1972 Oversight Committee (1972):

"In the coming months we will be examining the adequacy of State implementation plans. We will be working very closely with other Federal agencies and we anticipate that the interagency review process will be an invaluable asset in determining the availability of fuels, transportation programs, and public and private sector investment." [40]

The review by these other agencies and by the interagency committee is not a perfunctory review of the state plans. Their review, under the procedure established by the Administrator, covers half the time allowed the Administrator himself by law to act on the plans. It is inconceivable that these agencies, acting with the Administrator, in determining "the aggregate impact" of the plans and "in determining the availability of fuels, transportation programs, and public and private sector investment," do not consider and evaluate the technological and economic aspects of the plans under review. Nor is such evaluation inappropriate under the Amendments. After all, the Administrator's responsibility is to determine whether the proposed plan is practical and reasonably likely to achieve the results required under the Amendments; and, if he finds it reasonably unlikely to achieve such results within the fixed time-tables, whether for technological or economic reasons, or otherwise, he should reject the plan and return it to the state authorities with instructions to consider alternative procedures that might meet the statutory requirements as established by the Administrator.

■■ And when this Court reviews the action of the Administrator, it does not confine itself to the order of the Administrator or to the bare language of the state plan, nor will it seek to determine from the four corners of those two documents whether the action taken was

---

38. *See*, Hearings, Subcommittee on Air and Water Pollution, Committee on Public Works, 92d Cong., 2d sess. (1972), at 237.

39. Section 51.4(c), 40 C.F.R.

40. *See*, Hearings, Senate Subcommittee on Air and Water Pollution, Committee on Public Works, 92d Cong., 2d sess. (1972), at 230 and 236.

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." If judicial review were to be tethered to these abbreviated documents, it would "almost inevitably become[s] a meaningless gesture" and would be reduced to "a game of 'blind man's bluff'". [*sic*] [41] Courts require that administrative agencies "articulate the criteria" employed in reaching their result and are no longer content with bare administrative *ipse dixits* based on supposed administrative expertise. Environmental Defense Fund, Inc. v. Ruckelshaus, *supra*, at 586 of 439 F.2d. While an agency may have discretion to decide, "[D]iscretion to decide does not include a right to act perfunctorily or arbitrarily"; and, in order for a Court to make a critical evaluation of the agency's action and to determine whether it acted "perfunctorily or arbitrarily," the agency must in its decision "explicate fully its course of inquiry, its analysis and its reasoning." Ely v. Velde (4th Cir. 1971) 451 F.2d 1130, 1138–1139. And, in making its review, the Court must have, not merely that full articulation of the agency's reasoning, but it must also have "the whole record" on which the agency acted, or, as it is expressed in *Overton Park*, "the full administrative record that was before the Secretary at the time he made his decision." (401 U.S., at 420, 91 S.Ct. at 825). This is so, because, in its review, the Court is to "engage in a substantial inquiry" into the reasonableness of the agency action (Section 706, 5 U.S.C.) and as a part of that "inquiry" it "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"

(*Overton Park, supra*, 401 U.S. at 415–416, 91 S.Ct. at 823–824)[42] since "it is 'arbitrary or capricious' for an agency not to take into account all relevant factors in making its determination." [43] As applied to these proceedings, in order for the Court to make a rational determination, to make that "substantial inquiry" demanded of it in these cases calling for review of the validity of the Administrator's action, the Court must have before it the record of expert views and opinions, the technological data and other relevant material, including the state hearings, on which the Administrator himself acted. *Cf.*, Walter Holm & Company v. Hardin, *supra*, at 1015–1016 of 449 F.2d. No such record is now before the Court. The Administrator should promptly certify the "full record" that was before him at the time he approved the state plans involved in these actions.

When the records of the proceedings resulting in the approval of the state plans under review have been certified to this Court, the petitioners may, if they feel so entitled, apply to this Court for an order of remand, either because of the inadequacy of the state hearing or to take additional testimony as authorized under Section 1857h-5(c), 42 U.S.C., and, if they are able to satisfy the Court with the propriety of their motions, to secure a remand for that purpose. But the present motions are, in our judgment, premature until the Administrator has certified to this Court the full administrative record since, without that record, the Court cannot intelligently pass on the motions and determine either the adequacy of the state hearings or the right to take additional

---

41. *See*, First National Bank of Smithfield, North Carolina v. Saxon (4th Cir. 1965) 352 F.2d 267, 274 (Judge Sobeloff dissenting); Environmental Defense Fund, Inc. v. Ruckelshaus, *supra*, at 597–598 of 439 F.2d.

   *See, also*, D. C. Federation of Civic Associations v. Volpe (1971) 148 U.S.App. D.C. 207, 459 F.2d 1231, 1237:

   "Absent a record, judicial review of the Secretary's action can be little more

than a formality unless the District Court takes the disfavored step of requiring the Secretary to testify as to the basis of his decision."

42. *Cf.*, Note, Federal Administrative Law Developments—1971, Duke L.J. (1972), *supra*, at 317, 329.

43. Hanly v. Mitchell (2d Cir. 1972) 460 F.2d 640, 648.

testimony under Section 1857h-5(c), 42 U.S.C.

Finally, the petitioners challenge the approvals for failure to include an environmental impact statement. We are convinced that, while NEPA applies to "all agencies of the Federal Government" and requires an impact statement for every major federal action "significantly affecting the quality of the human environment," [44] it is inapplicable to the action of the Administrator in seeking, through the approval of state implementation plans, to improve "the quality of the human environment." As the Court said in Getty Oil Co. v. Ruckelshaus, *supra*, at 359 of 467 F.2d, "It is apparent that the Clean Air Act itself contains sufficient provisions for the achievement of those goals sought to be attained by NEPA."

Motions denied without prejudice to the right to renew.